# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE



**June 4, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

SARAH BETH CLINGAN OVERSTREET,  )
                                              )

    Plaintiff/Appellee,                  )

                                              )    Putnam Circuit

VS.                                      )    No. J-5125

                                              )

                                            )    Appeal No.

SHONEY'S, INC.,                  )    01A01-9612-CV-00566

                                            )

    Defendant/Appellant.         )

APPEAL FROM THE CIRCUIT COURT FOR PUTNAM COUNTY
AT COOKEVILLE, TENNESSEE

THE HONORABLE JOHN TURNBULL, JUDGE

For the Plaintiff/Appellee:

John K. Maddin, Jr.
Malcolm L. McCune
Maddin Miller & McCune
Nashville, Tennessee

William A. Cameron
Cameron & Chaffin
Cookeville, Tennessee

For the Defendant/Appellant:

Lawrence E. Levine
Levine Mattson Orr & Geracioti
Nashville, Tennessee

Jim H. Camp
Sparta, Tennessee

## AFFIRMED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

## O P I N I O N

This appeal involves a freakish accident in which a shard from a broken dinner plate caused a restaurant patron to lose the sight in her left eye. The patron and her husband filed suit against the waitress who dropped the plate and the restaurant in the Circuit Court for Putnam County seeking damages for her injuries and for his loss of consortium. Following a three-day trial, the jury awarded the patron $2,013,000. On this appeal, the restaurant takes issue with several of the trial court's evidentiary rulings, the trial court's verdict form, and the trial court's refusal to grant a remittitur. We affirm the judgment.

## I.

Sarah Beth Clingan Overstreet received her graduate nursing degree from Tennessee Technological University in Cookeville in May 1993. One month later, she went to work for Cookeville General Hospital. Because of her professors' encouragement, Ms. Overstreet planned to pursue an advanced nursing degree. She was also engaged to be married and had set an October 1993 wedding date.

On July 22, 1993, Ms. Overstreet and her fiancee decided to eat a late supper at the Shoney's Restaurant on Willow Road in Cookeville. Approximately fifteen feet from where Ms. Overstreet was seated, a server, who was serving other customers, held an iced tea pitcher in one hand and a serving tray with two ceramic dinner plates in the other. The server placed the pitcher on the lid of a partially open ice bin. As the pitcher began to fall from the ice bin, the server grabbed for it, and in the process, the two dinner plates fell from her tray and broke on the floor. A shard from one of the broken plates struck Ms. Overstreet in her left eye.

Ms. Overstreet heard the plates fall and immediately "felt something hot in my left eye." At first she thought it might be a piece of food or her contact lens, but when she saw blood on her napkin and her white blouse, she knew she had been cut. The wound was very painful, and Ms. Overstreet went into shock. She was treated initially in the emergency room at Cookeville General Hospital where it was discovered that the shard had cut her eye and that vitreous gel was protruding from the wound. Ms. Overstreet was quickly transferred to Vanderbilt University Hospital where surgeons closed the laceration. She remained hospitalized for several days on a regimen of antibiotics.

The Vanderbilt physicians feared that the retina of Ms. Overstreet's left eye would become detached and cause blindness in that eye. When the retina eventually detached, Ms. Overstreet underwent four additional surgeries in an attempt to stabilize her retina and save the sight in her left eye. The scar tissue that formed after each surgery prevented the retina from remaining in its normal position. The fourth surgery was an experimental procedure in which silicon oil was injected directly into the eye through tiny incisions. Ms. Overstreet experienced significant pain and discomfort during the five-month period when these surgeries were being performed. She also suffered psychologically as her ability to see through her left eye gradually deteriorated. As she described it, "[t]he last time that I saw anything was a little bitty pinhole of light in motion and it kept getting smaller and smaller and then there wasn't any more."

In March 1994, Ms. Overstreet underwent a fifth surgical procedure to relieve her pain and headaches and the irritation in her eye. The physician removed the experimental silicon oil and scraped calcium deposits from her cornea. Today, Ms. Overstreet is blind in her left eye. Her left eye also looks abnormal because it is red and irritated and because it is noticeably smaller than her right eye.

The injury to Ms. Overstreet's eye affects not only her vision but also her life. Her loss of vision dealt a tremendous blow to her self-confidence and to her perception of herself. Ms. Overstreet's psychologist diagnosed her as suffering from post-traumatic stress syndrome. For her part, Ms. Overstreet stated that she no longer likes herself and that she has changed from an outgoing, strong, and confident person to someone who does not want to leave the house. She has nightmares, sleep disorders, crying spells, and poor concentration and low self-esteem.

Ms. Overstreet has continued to work as a nurse; however, her clinical skills and outlook for further education and professional advancement have dwindled. While at one time she excelled at clinical care, she now finds it difficult to perform even the most basic procedures. She has difficulty measuring medicines or giving intravenous injections because of her loss of depth perception. She also becomes fatigued when she inputs clinical information into the computer. She now works the night shift because it is less busy than the day shift and she has declined offers to transfer to more acute care areas because of her concern that one of her errors might hurt a patient. An expert rehabilitative counselor has determined that Ms. Overstreet

is vocationally disabled in light of the physical and emotional requirements of nursing. As a result of the injury to and disfigurement of her eye, Ms. Overstreet has changed from an accomplished, motivated, and confident person whose prospects seemed endless to a person who is thankful just to get through another day.

In January 1994, Ms. Overstreet and her husband filed a negligence action in the Circuit Court for Putnam County against Shoney's and the server who dropped the dishes. Prior to trial, Ms. Overstreet's husband also voluntarily dismissed his claims against both Shoney's and the server because he was not married to Ms. Overstreet when she was injured. Ms. Overstreet likewise voluntarily dismissed her claims against the server. Following a three-day trial in March 1996, a jury returned a verdict against Shoney's for $2,013,000. Shoney's perfected this appeal after the trial court denied its motion for a new trial and/or a remittitur.

## II.
### THE SUFFICIENCY OF MS. OVERSTREET'S PLEADINGS

Shoney's first seeks to undermine the verdict by attacking the sufficiency of Ms. Overstreet's pleadings. It asserts that it could not be held responsible for the negligent acts of its server because Ms. Overstreet's complaint did not specifically allege the doctrine of respondeat superior. Shoney's reasons that Ms. Overstreet's decision to dismiss her claims against its server had the legal effect of undermining her claims against Shoney's. This argument is without merit because Shoney's stipulated that the server was acting within the scope of her employment when Ms. Overstreet was injured and that any negligence on the part of the server was chargeable to Shoney's.

A stipulation is an agreement between counsel regarding business before the court, *see State v. Ford*, 725 S.W.2d 689, 691 (Tenn. Crim. App. 1986), which is entered into mutually and voluntarily by the parties. *See State v. Morris*, 641 S.W.2d 883, 889 (Tenn. 1982). A stipulation obviates the need for evidence regarding the stipulated matters. *See Hunter v. Burke*, 958 S.W.2d 751, 755 (Tenn. Ct. App. 1997). Although the parties may not stipulate to questions of law, *see Mast Adver. & Publ'g, Inc. v. Moyers*, 865 S.W.2d 900, 902 (Tenn. 1993), stipulations within the range of possibly true facts and valid legal strategies are allowed. *See Mast Adver. & Publ'g, Inc. v. Moyers*, 865 S.W.2d at 902.

A stipulation regarding an agent acting within the scope of his or her employment may be based on a party's admissions of fact. *See Steiner-Liff Iron and Metal Co. v. Woodmont Country Club*, 480 S.W.2d 533, 537 (Tenn. 1972). On appeal, stipulations are binding on the parties and may not be altered. *See Bearman v. Camatsos*, 215 Tenn. 231, 236, 385 S.W.2d 91, 93 (1964); *First Southern Trust Co. v. Sowell*, 683 S.W.2d 680, 681 (Tenn. Ct. App. 1984).

In this case, Shoney's stipulated first at a pre-trial conference and then at trial that its server was acting within the scope of her employment with Shoney's when Ms. Overstreet was injured and that the server's negligence, if any, could be attributable to Shoney's under the theory of respondeat superior. This issue was established by the server's undisputed testimony and was included in the instruction to the jury without objection from Shoney's. Relying on this stipulation, Ms. Overstreet voluntarily non-suited her claim against the server. After agreeing to stipulate this issue at trial, Shoney's cannot now complain that Ms. Overstreet's pleadings are deficient.

## III.
### THE TRIAL COURT'S EVIDENTIARY RULINGS

Shoney's takes issue with two of the trial court's evidentiary rulings. First, it asserts that the trial court should not have permitted Ms. Overstreet to present evidence concerning her plans to pursue an advanced nursing degree. Second, it argues that the trial court erred by preventing it from cross-examining Ms. Overstreet concerning the results of an evaluation performed when she was an extern at Cookeville General Hospital between her second and third years of nursing school. We find no error with the trial court's decisions on both issues.

One of the trial court's essential responsibilities is to control the flow of evidence to the jury by ruling on the admissibility of evidence, controlling the order of the proof, and determining the scope of examination of the witnesses. *See Castelli v. Lien*, 910 S.W.2d 420, 425 (Tenn. Ct. App. 1995). A trial court has a wide degree of latitude in making these decisions. *See Hunter v. Burke*, 958 S.W.2d at 755; *Steele v. Ft. Sanders Anesthesia Group, Inc.*, 897 S.W.2d 270, 275 (Tenn. Ct. App. 1994). Accordingly, questions concerning the admissibility of evidence address themselves to the trial court's discretion, and the appellate courts will overturn the

trial court's decisions only on a showing of abuse of discretion. *See Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992); *Scott v. Jones Bros. Constr., Inc.*, 960 S.W.2d 589, 594 (Tenn. Ct. App. 1997).

Objections to the introduction of evidence must be timely and specific. They must be made contemporaneously with the objectionable testimony, *see Burchett v. Stephens*, 794 S.W.2d 745, 749 (Tenn. Ct. App. 1990); *Wachovia Bank & Trust Co. v. Glass*, 575 S.W.2d 950, 955 (Tenn. Ct. App. 1978), and they must state the specific ground on which they are based. *See Continental Nat'l Bank v. First Nat'l Bank*, 108 Tenn. 374, 379, 68 S.W. 497, 498-99 (1902); *Burton v. Farmers' Bldg. & Loan Ass'n*, 104 Tenn. 414, 418, 58 S.W. 230, 231 (1900). Therefore, they cannot be raised for the first time on appeal. *See Street Ry. v. Dan*, 102 Tenn. 320, 321-22, 52 S.W. 177, 178 (1899); *Horner v. Graham*, 64 S.W. 316, 318 (Tenn. Chan. App. 1901).

## A.
### ADMISSION OF EVIDENCE CONCERNING MS. OVERSTREET'S CAREER PLANS

Over Shoney's' objections, the trial court permitted Ms. Overstreet to introduce evidence regarding her plans to obtain an advanced nursing degree and to become certified as a registered nurse anesthetist. Shoney's asserts that admitting this evidence was error because the damages flowing from Ms. Overstreet's inability to earn an advanced degree were speculative and because the admission of this testimony must have been prejudicial in light of the jury's decision to award Ms. Overstreet $100,000 for lost earning capacity.

## 1.

The purpose of tort damages in Anglo-American law is to compensate the wronged party for damage or injury caused by the defendant's conduct. *See Inland Container Corp. v. March*, 529 S.W.2d 43, 44 (Tenn. 1975); *Louisville, Nashville & Great Southern R.R. v. Guinan*, 79 Tenn. 98, 103 (1883); *Vertrees v. Tennessee Auto Corp.*, 5 Tenn. App. 140, 151 (1927). The goal of awarding damages is to repair the wronged party's injury or, at least, to make the wronged party whole as nearly as may be done by an award of money. *See* Restatement (Second) of Torts § 901, cmt. a (1979); 4 Fowler V. Harper, et al., *The Law of Torts* § 25.1, at 493 (2d ed. 1986) ("Harper").

The party seeking damages has the burden of proving them. *See Inman v. Union Planters Nat'l Bank*, 634 S.W.2d 270, 272 (Tenn. Ct. App. 1982). In tort cases, the proof of damages need not be exact or mathematically precise. *See Provident Life & Accident Ins. Co. v. Globe Indem. Co.*, 156 Tenn. 571, 576, 3 S.W.2d 1057, 1058 (1928); *Airline Constr. Inc. v. Barr*, 807 S.W.2d 247, 274 (Tenn. Ct. App. 1990). Rather, the proof must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the damages. *See Pinson & Assocs. Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486, 488 (Tenn. Ct. App. 1990); *Wilson v. Farmers Chem. Ass'n*, 60 Tenn. App. 102, 111, 444 S.W.2d 185, 189 (1969). The amount of damages is not controlled by fixed rules of law, *see Blalock v. Temple*, 38 Tenn. App. 463, 470, 276 S.W.2d 493, 497 (1954), or mathematical formulas. *See Brown v. Null*, 863 S.W.2d 425, 429-30 (Tenn. Ct. App. 1993). It is instead left to the sound discretion of the trier of fact. *See Reeves v. Catignani*, 157 Tenn. 173, 176, 7 S.W.2d 38, 39-40 (1928); *Sholodge Franchise Sys., Inc. v. McKibbon Bros., Inc.*, 919 S.W.2d 36, 42 (Tenn. Ct. App. 1995).

Damages may never be based on mere conjecture or speculation. *See Western Sizzlin, Inc. v. Harris*, 741 S.W.2d 334, 335-36 (Tenn. Ct. App. 1987); *Nashland Assocs. v. Shumate*, 730 S.W.2d 332, 334 (Tenn. Ct. App. 1987). However, uncertain or speculative damages are prohibited only when the existence, not the amount, of damages is uncertain. *See Jennings v. Hayes*, 787 S.W.2d 1, 3 (Tenn. Ct. App. 1989); *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn. Ct. App. 1983). Evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty. *See Airline Constr., Inc. v. Barr*, 807 S.W.2d at 274; *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn. Ct. App. 1985).

Loss or impairment of future earning capacity is an element of damages in a personal injury action. *See Wolfe v. Vaughn*, 177 Tenn. 678, 687, 152 S.W.2d 631, 635 (1941); *Acuff v. Vinsant*, 59 Tenn. App. 727, 733, 443 S.W.2d 669, 672 (1969). Earning capacity refers not to actual earnings, but rather to the earnings that a person is capable of making. *See Southern Coach Lines v. Wilson*, 31 Tenn. App. 240, 243, 214 S.W.2d 55, 56 (1948) (earning capacity refers to the loss of the power to earn); *see also Anderson v. Litzenberg*, 694 A.2d 150, 161 (Md. Ct. Spec. App. 1997); Restatement (Second) of Torts § 924(b) (1979).

The extent of an injured person's loss of earning capacity is generally arrived at by comparing what the person would have been capable of earning but for the injury with what the person is capable of earning after the injury. *See Hunter v. Hardnett*, 405 S.E.2d 286, 288 (Ga. Ct. App. 1991); *LaFever v. Kemlite Co.*, 706 N.E.2d 441, 455 (Ill. 1998); *Bergquist v. Mackay Engines, Inc.*, 538 N.W.2d 655, 659 (Iowa Ct. App. 1995); *Wal-Mart Stores v. Cordova*, 856 S.W.2d 768, 770 (Tex. Ct. App. 1993); *Klink v. Cappelli*, 508 N.W.2d 435, 437 (Wis. Ct. App. 1993); Restatement (Second) of Torts § 924 cmt. d (1979). If the injury is permanent,[1] this amount should be multiplied by the injured person's work life expectancy, and the result should be discounted to its present value. *See Conte v. Flota Mercante Del Estado*, 277 F.2d 664, 669 (2d Cir. 1960); *Athridge v. Iglesias*, 950 F. Supp. 1187, 1193 (D.D.C. 1996); *Yosuf v. United States*, 642 F. Supp. 432, 440 (M.D. Pa. 1986); *Montgomery Ward & Co. v. Gregg*, 554 N.E.2d 1145, 1164-65 (Ind. Ct. App. 1990); *Anderson v. Litzenberg*, 694 A.2d at 162.

The injured party has the burden of proving his or her impairment of earning capacity damages. *See Sutton v. Overcash*, 623 N.E.2d 820, 838 (Ill. Ct. App. 1993); *Southwestern Bell Tel. Co. v. Sims*, 615 S.W.2d 858, 864 (Tex. Ct. App. 1981). In order to recover these damages, the injured person must first prove with reasonable certainty that the injury has or will impair his or her earning capacity. *See Moattar v. Foxhall Surgical Assocs.*, 694 A.2d 435, 439-40 (D.C. 1997); *Barnes v. Cornett*, 213 S.E.2d 703, 705 (Ga. Ct. App. 1975); *Wahwasuck v. Kansas Power & Light Co.*, 828 P.2d 923, 931 (Kan. 1992); *Young v. Stewart*, 399 S.E.2d 344, 346-47 (N.C. Ct. App. 1991). Then, the injured party must introduce evidence concerning the extent of the impairment of his or her earning capacity.

The proof concerning impairment of earning capacity is, to some extent, speculative and imprecise. *See Marress v. Carolina Direct Furniture, Inc.*, 785 S.W.2d 121, 123 (Tenn. Ct. App. 1989); *see also Altman v. Alpha Obstetrics & Gynecology, P.C.*, 679 N.Y.S.2d 642, 643-44 (N.Y. App. Div. 1998); *Shivers v. Riney*, 695 P.2d 951, 955 (Or. Ct. App. 1985); *Border Apparel-East, Inc. v. Guadian*, 868 S.W.2d 894, 897 (Tex. Ct. App. 1993); 4 Harper, § 25.8, at 553; 2 Stuart M.

---

[1]Damages for impairment of earning capacity may be awarded for either permanent or temporary impairments. *See Dingus v. Cain*, 56 Tenn. App. 294, 297, 406 S.W.2d 169, 171 (1966); *Southern Coach Lines v. Wilson*, 31 Tenn. App. at 243, 214 S.W.2d at 56. If the impairment is temporary, the multiplier should be the duration of the actual impairment rather than the injured person's work life expectancy.

Speiser, et al., *The American Law of Torts* § 8:27, at 625 (1985) ("Speiser"). However, this imprecision is not grounds for excluding the evidence. *See Turrietta v. Wyche*, 212 P.2d 1041, 1047-48 (N.M. 1949); *Kaczkowski v. Bolubasz*, 421 A.2d 1027, 1037 (Pa. 1980).

The courts have found competent and admissible any evidence which tends to prove the injured person's present earning capacity and the probability of its increase or decrease in the future. *See Martinez v. Jordan*, 553 P.2d 1239, 1240 (Ariz. Ct. App. 1976); *Anderson v. Litzenberg*, 694 A.2d at 162; *Turrietta v. Wyche*, 212 P.2d at 1047; *Wilson v. B.F. Goodrich Co.*, 627 P.2d 1280, 1282 (Or. Ct. App. 1981). Thus, the courts have routinely admitted evidence concerning numerous factors, including the injured person's age, health, intelligence, capacity and ability to work, experience, training, record of employment, and future avenues of employment. *See Marress v. Carolina Direct Furniture, Inc.*, 785 S.W.2d at 123-24; *Clinchfield R.R. v. Forbes*, 57 Tenn. App. 174, 184-85, 417 S.W.2d 210, 215 (1966); *see also Kwapien v. Starr*, 400 N.W.2d 179, 184 (Minn. Ct. App. 1987); *Allers v. Willis*, 643 P.2d 592, 595 (Mont. 1982); *Schaefer v. McCreary*, 345 N.W.2d 821, 824 (Neb. 1984); 4 Harper, § 25.8, at 550; 2 Speiser, § 8:27, at 631-32.

Impairment of earning capacity is not necessarily measured by an injured person's employment or salary at the time of the injury. *See Schaefer v. McCreary*, 345 N.W.2d at 824. It is not uncommon for an injured person to assert that an injury has caused him or her to abandon plans to change employment, to obtain additional education or training, or to otherwise advance their career. In the face of such an assertion, the trier of fact must distinguish between persons with only vague hopes of entering a new profession and those with the demonstrated ability and intent to do so. *See* Jacob A. Stein, 2 *Personal Injury Damages* § 6:15, at 6-55 (Gerald W. Boston, ed., 3d ed. 1997). Often, making this distinction depends on the steps the person has actually taken to accomplish his or her educational or career goals.

Students are among the class of injured persons for whom educational and career plans are relevant in determining impairment of earning capacity. A majority of courts have concluded that a student or trainee has the right to have a jury consider his or her education, training, and proposed occupation or career in calculating damages for impaired earning capacity. Thus, a student may present evidence of his or her educational accomplishments and plans and of the earning potential of persons

engaged in the profession or career the student intends to pursue, as long as the evidence is not wildly speculative. *See Dickens v. United States*, 545 F.2d 886, 892-93 (5th Cir. 1977) (a medical student aspiring to be a surgeon was permitted to present evidence of his academic success, his medical training, and his clear intent and aptitude); *Whittle v. Schemm*, 402 F. Supp. 1294, 1299-1300 (E.D. Pa. 1975) (a first-year junior college student was permitted to present evidence of his plans to become an architect); *Bowens v. Patterson*, 716 So. 2d 69, 87-88 (La. Ct. App. 1998) (a high school student was permitted to present evidence of plans to attend college and graduate with a degree in computer science); *Lee v. USAA Cas. Ins. Co.*, 540 So. 2d 1083, 1091-92 (La. Ct. App. 1989) (a high school student was permitted to present evidence of plans to attend college and have a career in banking); *Kenton v. Hyatt Hotels Corp.*, 693 S.W.2d 83, 92-94 (Mo. 1985) (a second-year law student was permitted to present evidence concerning her plans to graduate from law school and have a legal career).[2]

## 2.

Far from being speculative, Ms. Overstreet's evidence concerning the impairment of her earning capacity is compelling. She demonstrated with a reasonable degree of certainty that the injury to her eye is permanent and that it has affected her ability to advance in the nursing profession. Ms. Overstreet, her husband, her nursing professors, and her rehabilitative counselor testified at trial concerning her plans to pursue an advanced nursing degree. This evidence established that prior to her injury, Ms. Overstreet had the academic preparation, ability, and perseverence to attain an advanced nursing degree and a more advanced level of specialization.

She graduated from high school with honors and earned baccalaureate degrees from Tennessee Technological University in both psychology and nursing. Ms. Overstreet's professors described her as diligent and committed and as an exceptional student who was an excellent candidate for an advanced degree and who had unlimited opportunities in nursing. From this proof, a jury could reasonably conclude

---

[2]The courts have reached similar conclusions with regard to promising athletes whose careers were cut short. *See Clinchfield R.R. v. Forbes*, 57 Tenn. App. at 185, 417 S.W.2d at 215; *Connolly v. Pre-mixed Concrete Co.*, 319 P.2d 343, 345-46 (Cal. 1957); *Horton v. McCrary*, 620 So. 2d 918, 931 (La. Ct. App. 1993), *rev'd on other grounds*, 635 So.2d 199 (La. 1994).

that Ms. Overstreet had the motivation, aptitude, and inclination to pursuing further nursing training that would have enhanced her earning capacity.

Shoney's places great significance on the fact that Ms. Overstreet had not yet applied to a graduate nursing program when she was injured and argues that her failure to do so renders her plans to pursue a graduate nursing degree speculative at best. We disagree. An injured party is not required to be enrolled in an educational or training program in order to testify about his or her future educational plans. *See Whittle v. Schemm*, 402 F. Supp. at 1299-1300. Ms. Overstreet satisfactorily explained why she did not apply to a graduate nursing program immediately upon receiving her baccalaureate degree from Tennessee Technological University. She presented uncontradicted evidence that it was common, and even recommended, that nurses obtain at least one year of practical clinical experience before entering a graduate nursing program.

Ms. Overstreet's work life expectancy was at least another thirty years when she was injured. She testified that her injury has made it difficult for her to perform routine nursing tasks, such as measuring medicines and giving intravenous injections. Thus, her eye injury has not only curtailed her plans to obtain a masters degree in nursing or to become a certified registered nurse anesthetist or neonatal nurse practitioner but has also impaired her ability to continue to work as a registered nurse. In light of Ms. Overstreet's work life expectancy, the evidence of her salary when she was injured,[3] and the salaries of nurses with graduate degrees and certified registered nurse anesthetists,[4] the fact that the jury awarded Ms. Overstreet $100,000 for impairment of her earning capacity is consistent with the evidence.

## B.
### THE ADMISSION OF THE 1992 EXTERN EVALUATION FORM

The second evidence question involves the admission and use of a hospital personnel change notice form containing an evaluation of Ms. Overstreet's performance as an extern in 1992. Shoney's insists that the trial court's actions concerning the admission and weight of the document were prejudicial in two ways.

---

[3]Ms. Overstreet was earning $33,000 per year when she was injured.

[4]Certified nurse anesthetists earn approximately $66,000 per year, and nurses with graduate degrees earn between $40,000 and $50,000 per year.

First, it argues that the initial decision concerning the form's admissibility prevented it from effectively cross-examining Ms. Overstreet. Second, it argues that the later admission of the form was undermined by the trial court's cautionary instructions concerning the form. We find both claims without merit.

**1.**

Ms. Overstreet participated in a ten-week extern program at Cookeville General Hospital following her third year of nursing school. The purpose of the program was to provide nursing students with additional clinical experience. Each extern was assigned to work with another nurse at the hospital. Ms. Overstreet was assigned to a nurse working on the night shift.

Following the completion of the summer extern program, the hospital routinely completed a "personnel change notice" form for each extern to indicate that their externship was completed. For employees leaving the employment of the hospital -- as these externs were -- the form required the employee's supervisor and other management personnel to rate the departing employee's performance and to indicate whether the employee was eligible to be rehired. The form also contained signature lines for the employee's supervisor, the department head, and the hospital administrator. Departing employees did not receive a copy of this form; however, a copy was placed in their hospital personnel file.

On September 14, 1992, the hospital generated a personnel change notice form for Ms. Overstreet's externship which had been completed on July 31, 1992. The supervisor of nursing signed the form on September 14, 1992 even before the blanks for Ms. Overstreet's performance ratings had been filled in. These blanks were not filled in by the nurse working directly with Ms. Overstreet, but rather by a nurse manager who was working on the orthopaedic floor during the day shift and who had never worked with Ms. Overstreet. The nurse manager later candidly conceded that she had no direct knowledge of Ms. Overstreet's performance and that she had based her comments on information supplied by others. On the form, Ms. Overstreet's attendance was rated "above average;" the quality of her work and her general efficiency were rated as "average;" and her dependability and initiative were rated as "below average." The nurse manager also checked the box indicating that Ms. Overstreet was eligible to be rehired. The form was later signed by the hospital

administrator and reviewed by the hospital's human resources director. The human resources director wrote "questionable rehire" on the form to remind her to inquire into the two below average ratings should Ms. Overstreet decide later to seek employment at the hospital. Thereafter, the form was placed in Ms. Overstreet's personnel file.

Shoney's obtained a copy of the contents of Ms. Overstreet's hospital personnel file during pretrial discovery. The file contained not only the 1992 extern evaluation but also later evaluations performed after Ms. Overstreet went to work for the hospital as a nurse. The parties apparently stipulated prior to trial that these records were admissible as business records under Tenn. R. Evid. 803(6).[5] One of the attorneys representing Shoney's cross-examined Ms. Overstreet extensively concerning the hospital's evaluations of her performance after she accepted full time employment with the hospital. Ms. Overstreet identified these post-evaluation forms, and the trial court admitted them into evidence without objection.

Shoney's counsel then turned his attention to the evaluation of Ms. Overstreet's performance as an extern in 1992. Ms. Overstreet testified that she did not remember being evaluated during her externship and that she could not identify the September 1992 evaluation form because she had never seen it before. Following an off-the-record bench conference, the attorney changed the direction of his cross-examination and began questioning Ms. Overstreet about her plans for raising a family. The cross-examination concluded a few questions later.

The trial court dismissed the jury for the day following Ms. Overstreet's testimony. In the jury's absence, the trial court stated for the record what had transpired during the bench conference. The trial court explained that the personnel change notice form could be marked for identification but that the form could not be introduced into evidence through Ms. Overstreet because she could not identify it.[6]

[5]The stipulation does not appear in the record. Theoretically, one party could have understood that the stipulation extended only to the authenticity of the documents, while the other could have assumed that the stipulation covered both authentication and admissibility. In the absence of evidence to the contrary, we have concluded that the stipulation extends to both authenticity and admissibility because Ms. Overstreet has not taken issue with Shoney's characterization of the issue.

[6]Specifically, the trial court stated:

And I want to explain for the record the reason that I have excluded this exhibit. It's the type of information that begs cross-examination. It indicates on it

-13-

At that point, one of Shoney's attorneys stated for the record that he objected to the trial court's refusal to permit him to cross-examine Ms. Overstreet using the form. He asserted that the form was admissible as a business record and that it was relevant "to the major issue in this case, the degree of her [Ms. Overstreet's] depression before and after this particular accident."

Shoney's later called three witnesses who were involved in the preparation and custody of the excluded form. Each witness identified the document and explained their role in its preparation. However, each witness also conceded that they were not personally familiar with Ms. Overstreet's performance as an extern and that the information concerning her performance was obtained from others. At this juncture, the trial court admitted the form into evidence and permitted the witnesses to be examined and cross-examined concerning the contents of the form. However, the trial court also gave the jury a cautionary instruction concerning its consideration of the information on the form. Shoney's did not attempt to recall and cross-examine Ms. Overstreet about the form after it was admitted into evidence.

## 2.

Lawyers and judges regard cross-examination as an essential safeguard of the accuracy and completeness of testimony. *See* 1 *McCormick on Evidence* § 19, at 78 (John W. Strong ed., 4th Practitioner's ed. 1992). It enables the trier-of-fact to assess a witness's demeanor, sincerity, and ability to perceive, recall, or narrate past events. See Neil P. Cohen, et al., *Tennessee Law of Evidence* § 607.3, at 338 (3d ed. 1995). Its purpose is to adduce from a witness any information that may clarify, qualify, or undercut a witness's testimony on direct examination, impair its effectiveness, or affect the inferences the trier-of-fact might draw. See Roberto Aron, et al., *Cross-Examination of Witnesses* § 2.06 (1989) (quoting Professor Anthony G. Amsterdam).

---

below-average initiative, questionable rehire, below-average dependability. It does not indicate that she participated in the evaluation to any extent. She could not identify it. And even though it may be a part of the Cookeville General Hospital record, it's hearsay within hearsay. It's not only hearsay within hearsay, but it's opinion within hearsay.

And it would be my judgment that it would - - to permit this personnel change notice to be introduced to the jury without cross-examination, without allowing the other side to know the source of it, to face the person who made the evaluation, would be unfair and undue prejudice far outweighing any relevance it might have to this case.

Lawyers should be accorded wide latitude in cross-examining witnesses. *See Crunk v. Grooms*, 60 Tenn. App. 611, 620, 450 S.W.2d 15, 20 (1969); *Union Traction Co. v. Todd,* 16 Tenn. App. 200, 208, 64 S.W.2d 26, 30 (1933). However, despite its salutary purpose, cross-examination is subject to reasonable limitations to prevent obstruction of the orderly progress of a trial. These limitations are left to the trial court's discretion. *See Edwards v. State*, 221 Tenn. 60, 66, 424 S.W.2d 783, 786 (1968); *Austin v. City of Memphis*, 684 S.W.2d 624, 631 (Tenn. Ct. App. 1984); *Wagner v. Niven*, 46 Tenn. App. 581, 598, 332 S.W.2d 511, 519 (1959). Thus, the trial court may use its discretion to prevent lawyer misconduct, *see* Tenn. R. Evid. 611(a), to avoid unfair prejudice, confusion, or waste of time, *see* Tenn. R. Evid. 403, and to ensure compliance with other applicable rules of evidence and procedure.

The fact that these decisions are characterized as discretionary reflects a recognition that they involve a choice among acceptable alternatives. *See Card v. Tennessee Civil Serv. Comm'n*, 981 S.W.2d 665, 666 (Tenn. Ct. App. 1998). It also indicates that the appellate courts will not interfere with a trial court's decision simply because the trial court did not choose the alternative that the appellate court would have chosen. *See BIF v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at * 6 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed).

Discretionary decisions are not entirely immune from appellate scrutiny but are subjected to less rigorous appellate scrutiny. *See* Martin B. Louis, *Allocating Adjudicative Decision Making Authority Between the Trial and Appellate Level: A Unified View of the Scope of Review, the Judge/Jury Question, and Procedural Discretion*, 64 N.C.L. Rev. 993, 1045-46 (1986); Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above*, 22 Syracuse L. Rev. 635, 667 (1971). Discretionary decisions must take applicable law into account and must be consistent with the facts before the court. *See Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996) (holding that the trial court must give due consideration to the applicable law and facts). Thus, the appellate courts will set aside a trial court's discretionary decision only when the decision is based on a misapplication of the controlling legal principles or on a clearly erroneous assessment of the evidence. *See Alside Supply Ctr. v. Smith Heritage Siding Co.*, No. 03A01-9797-CH-00069, 1997 WL 414982, at * 1 (Tenn. Ct. App. July 25, 1997) (No Tenn. R. App. P. 11 application filed) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S. Ct. 2447, 2461 (1990)); *see also James, Cooke & Hobson, Inc. v. Lake Havasu*

*Plumbing & Fire Protection*, 868 P.2d 329, 332 n.4 (Ariz. Ct. App. 1993); *Canalez v. Bob's Appliance Serv. Ctr., Inc.*, 972 P.2d 295, 302 (Haw. 1999); *Emmons v. Purser*, 973 S.W.2d 696, 699 (Tex. Ct. App. 1998); *Shiel v. Ryu*, 506 S.E.2d 77, 82 (W. Va. 1998).

When reviewing a trial court's discretionary decision, appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision. *See In re Conservatorship of Scharles*, 285 Cal. Rptr. 325, 329 (Ct. App. 1991); *Citicorp Mortgage, Inc. v. Burgos*, 629 A.2d 410, 412 (Conn. 1993); *Onwuteaka v. Gill*, 908 S.W.2d 276, 280 (Tex. Ct. App. 1995). Appellate courts should permit a trial court's discretionary decision to stand if reasonable judicial minds can differ concerning its propriety. *See In re Marriage of Breuer*, 630 N.E.2d 1245, 1247 (Ill. Ct. App. 1994); *Fusaro v. First Family Mortgage Corp.*, 897 P.2d 123, 132 (Kan. 1995); *T.D.J. Dev. Corp. v. Conservation Comm'n of N. Andover*, 629 N.E.2d 328, 331-32 (Mass. Ct. App. 1994); *Phillips v. Deihm*, 541 N.W.2d 566, 571 (Mich. Ct. App. 1995); *Bridge v. Karl's, Inc.*, 538 N.W.2d 521, 523 (S.D. 1995).

### 3.

Shoney's asserts that the trial court erred by preventing it from introducing the 1992 personnel change notice form during its cross-examination of Ms. Overstreet. It argues that the trial court's decision improperly "shifted the burden" to Shoney's to lay the foundation for admission of the exhibit. This argument overlooks the distinction between the admissibility of documents and the admissibility of the contents of documents.

Tennessee has long recognized the "English rule" which permits the scope of cross-examination to exceed the scope of the witness's direct examination. *See Sands v. Southern Ry.*, 108 Tenn. 1, 9, 64 S.W. 478, 480 (1901); *Ray v. Hutchison*, 17 Tenn. App. 477, 483, 68 S.W.2d 948, 952 (1933). Thus, litigants may prove elements of their own case during the cross-examination of their opponent's witnesses. These common-law precedents are now embodied in Tenn. R. Evid. 611(b) which states, in part, that "[a] witness may be cross-examined on any matter relevant to any issue in the case."

Cross-examination is not, however, a "universal solvent" that somehow renders all evidence admissible. *See* IIIA John H. Wigmore, *Evidence* § 878, at 648 (Chadbourne rev. 1970). Substantive evidence introduced during cross-examination must comply with the same requirements as evidence introduced during direct examination. Thus, litigants seeking to admit business records into evidence during cross-examination of a witness must satisfy the authentication requirements of Tenn. R. Evid. 901 and the foundation requirements of Tenn. R. Evid. 403 & 803(6). If the business record contains hearsay statements, the litigant seeking to introduce the record must also demonstrate that the statements in the record are likewise admissible. *See Kanipes v. North Am. Phillips Elecs. Corp.*, 825 S.W.2d 426, 428 (Tenn. Ct. App. 1991); *Butler v. Ballard*, 696 S.W.2d 533, 536 (Tenn. Ct. App. 1985).

The source of Shoney's discontent with the trial court's ruling is its belief that the parties' pre-trial stipulation rendered the contents of Ms. Overstreet's personnel file admissible. In the absence of proof concerning its terms, we have construed the stipulation to extend to two threshold requirements only. First, the parties agreed that the copies of the documents taken from Ms. Overstreet's hospital personnel file were true and accurate copies of the documents actually in Ms. Overstreet's file. This agreement satisfied the authentication requirements in Tenn. R. Evid. 901. Second, the parties agreed that the documents in Ms. Overstreet's personnel file were records of a regularly conducted business activity. This agreement satisfied the foundation requirements for the "business records" exception to the hearsay rule in Tenn. R. Evid. 803(6).

We find no indication in the appellate record that the parties stipulated that every record in Ms. Overstreet's hospital personnel file was relevant or that every hearsay statement or opinion contained in these business records would be admissible. Thus, when challenged, Shoney's had the burden of demonstrating that particular hearsay statements contained in the records in Ms. Overstreet's personnel file were admissible. Shoney's had not carried this burden when it attempted to introduce the opinions concerning Ms. Overstreet's performance as an extern during its cross-examination of Ms. Overstreet.

Shoney's intended to accomplish two things by cross-examining Ms. Overstreet concerning the 1992 personnel change notice form. First, it desired to

place evidence before the jury that Ms. Overstreet's superiors found her initiative and dependability to be "below average" prior to the accident. Second, it desired to undermine Ms. Overstreet's credibility and favorable appraisal of her own initiative by proving that her co-workers' opinions of her performance in 1992 differed from her own. Both these purposes were proper, but they hinged on Shoney's ability to demonstrate that the statements of opinion concerning Ms. Overstreet's performance in 1992 were admissible. Unfortunately for Shoney's, Ms. Overstreet could not provide the necessary foundation for this strategy to be successful.

Ms. Overstreet did not refer to the 1992 form during her direct examination and did not use it to refresh her memory at any point during her testimony. She played no role in preparing the form and could not even remember being evaluated during her 1992 externship. She could not identify the 1992 form when confronted with it during cross-examination. Likewise, she could not identify the person or persons who evaluated her or whose notations appeared on the form.

Trial courts should not permit a witness to be cross-examined concerning the contents of a document unless the document has already been admitted into evidence or unless the document will be introduced into evidence before the conclusion of the cross-examination. *See Sharman v. Skaggs Cos.*, 602 P.2d 833, 837 (Ariz. Ct. App. 1979); *State v. Green*, 372 A.2d 133, 136 (Conn. 1976); *Henson v. Veteran's Cab Co.*, 185 N.W.2d 383, 388 (Mich. 1971); *State v. Hale*, 371 S.W.2d 249, 254 (Mo. 1963); *Logan v. Grady*, 482 S.W.2d 313, 320 (Tex. Ct. App. 1972); *see also* 81 Am. Jur. 2d *Witnesses* § 829, at 680 (1992); 98 C.J.S. *Witnesses* § 391, p. 163 (1957). Any other rule would effectively prevent the other parties, including the party who called the witness, from examining the witness concerning the contents of the document.

This record contains two independently sufficient reasons for upholding the trial court's decision to limit Shoney's cross-examination of Ms. Overstreet based upon the contents of the 1992 personnel change notice form. First, Ms. Overstreet's answers to questions concerning the 1992 form conclusively demonstrate that the document and the opinions in the document were beyond Ms. Overstreet's personal knowledge. Accordingly, she could not have provided the proper foundation for admitting the document into evidence. Second, the lack of evidence concerning who performed the evaluation, how the evaluation was performed, and the basis for the

evaluation provided the trial court with sufficient basis to question the document's trustworthiness under Tenn. R. Evid. 803(6) and to conclude that permitting the introduction of the document through Ms. Overstreet would unfairly prejudice Ms. Overstreet and would otherwise confuse the issues and mislead the jury under Tenn. R. Evid. 403. Accordingly, we find that the trial court properly declined to permit Shoney's to introduce the 1992 form during Ms. Overstreet's cross-examination.

## C.
### THE LIMITING INSTRUCTIONS

The trial court eventually permitted Shoney's to introduce Ms. Overstreet's 1992 personnel change notice form after Shoney's called three witnesses who played a role in the preparation of the form. However, each witness conceded that the opinions in the form concerning Ms. Overstreet's performance as an extern were formed by others and that they had no personal knowledge that would have enabled them to form their own opinion regarding Ms. Overstreet's initiative during the summer of 1992. Following these witnesses' testimony, the trial court instructed the jury that:

> Members of the jury, I have admitted Exhibit 23. I would remind you that any opinion expressed on that form is to be received under the same standards that I told you about expert opinion before. In other words, if the opinion that might be expressed on that form is not backed up by evidence, then you would ignore it.

Shoney's now argues that these instructions seriously and inappropriately undermined the value of the exhibit.

None of the witnesses who testified concerning the 1992 evaluation form were qualified as experts in human behavior, including motivation or initiative. Thus, they were testifying as lay persons when they were asked about Ms. Overstreet's initiative during her 1992 externship. As lay persons, they could only give an opinion concerning Ms. Overstreet's initiative if their opinion was "rationally based" on their own perceptions. *See* Tenn. R. Evid. 701(a)(1). Thus, their opinions concerning Ms. Overstreet's initiative must have been based on their personal knowledge. *See* Tenn. R. Evid. 602; *see also In re Estate of Elam*, 738 S.W.2d 169, 172 (Tenn. 1987); *Bills v. Lindsay*, 909 S.W.2d 434, 439 (Tenn. Ct. App. 1993) (holding that lay opinions concerning the soundness of a person's mind must be based on conversations,

-19-

appearances, and conduct); *Edwards v. State*, 540 S.W.2d 641, 648 (Tenn. 1976) (lay opinions concerning a person's sanity must be based on personal observation); *McCandless v. Oak Constructors, Inc.*, 546 S.W.2d 592, 598 (Tenn. Ct. App. 1976) (lay opinions concerning a person's intoxication must be based on personal observation).

Tenn. R. Evid. 701 requires lay witnesses to explain the basis for their personal knowledge of the facts that form the basis of their opinion. *See* Neil P. Cohen et al., *Tennessee Law of Evidence* § 701.3 (3d ed. Supp. 1998). Thus, lay opinions that are based on facts or circumstances not in evidence must be rejected. *See Pierce v. Pierce*, 174 Tenn. 508, 510, 127 S.W.2d 791, 792 (1939). In our view, the trial court would have been justified in excluding Exhibit 23 because none of the witnesses had personal knowledge of the factual basis for the opinion Exhibit 23 contained concerning Ms. Overstreet's initiative. However, the trial court decided to admit Exhibit 23 with a limiting instruction. The limiting instruction was consistent with *Pierce v. Pierce*, and, therefore, we decline to find that the trial court abused its discretion by giving this instruction contemporaneously with the admission of the exhibit.

# IV.
## THE VERDICT FORM

Shoney's also takes issue with the procedure devised by the trial court to facilitate the jury's consideration of Ms. Overstreet's damage claims. It asserts that the trial court infringed on its right to a general verdict by providing the jury with a "verdict form" that separately itemized each of Ms. Overstreet's damage claims. It also asserts that the verdict form prompted the jury to award duplicate, overlapping damages for the same injury. We find no reversible error in the preparation and use of the verdict form in this case.

## A.

Prior to the conclusion of the trial, the trial court provided counsel with drafts of its proposed jury instructions and with a form the court planned to provide the jury to aid in its deliberations. While Shoney's did not object to the proposed instructions, it objected strenuously to the proposed verdict form which itemized each of the types

of damages sought by Ms. Overstreet. The sole basis for the objection was that the verdict form required the jury to render a series of special verdicts even though Shoney's had requested a general verdict in accordance with Tenn. R. Civ. P. 49.03. The trial court responded that it intended to ask the jury to return a general verdict and that the verdict form was intended to be only a "guide" for the jury's deliberations.

The trial court's instructions contained directions regarding the process for calculating the damages if the jury decided that Ms. Overstreet was entitled to recover from Shoney's. These instructions, for the most part, tracked the Tennessee Pattern Jury Instructions. Referring first to "non-economic damages," the trial court instructed the jury to

> determine the reasonable compensation for any physical pain and suffering, disfigurement, permanent impairment and loss of capacity for the enjoyment of life suffered by the plaintiff and of which her injury was the legal cause, and for pain and suffering and loss of capacity for the enjoyment of life in the past and those which more likely than not will be experienced in the future from the same cause.

Then, referring to "economic damages,"[7] the trial court stated that the jury

> should also consider what, if any, income damages were or will be suffered. These include:
> No. 1 is the reasonable value of medical care, services and supplies reasonably required and actually given in the treatment of the plaintiff and the present cash value of similar services reasonably expected to be required in the future in the treatment of the plaintiff; and
> Second, the value of earning capacity loss in the past and that will be reasonably expected to be lost in the future as a result of the injury in question . . .
>
> *          *          *
>
> You are not permitted to award a party speculative damages which means compensation for loss or harm which, although possible, is conjectural or not reasonably certain. However, if you determine that a party is entitled to recover, you should compensate for loss or harm which has been suffered and in addition, for loss or harm which is reasonably expected, more probably than not, to be suffered in the [future] as a legal result of the injury in question.

---

[7]The version of the trial court's instructions in the transcript refers to "income damages," while the trial court's written instructions in the technical record refer to "economic damages."

Following these instructions, the trial court turned to the verdict form and the procedure for reporting the verdict. The verdict form the court provided the jury was as follows:

> We, the jury, present the following answers to the questions submitted by the Court:
>
> 1. Was the defendant Shoney's Inc. guilty of negligence which was the legal cause of the injury to the plaintiff?   Yes_____           No_____
>
> If the answer to Question One is "No", simply sign the verdict form, and you [do] not need to fill out Question Two since you will have found the issues in favor of the defendant.
>
> 2. If so, set forth the amount of damages, if any, you find have been proven by a preponderance of the evidence in each of the following categories:
>
>     a.        NON-ECONOMIC DAMAGES:
>
> | | | |
> |---|---|---|
> | 1. | Physical pain and suffering - past | $_____ |
> | 2. | Physical pain and suffering - future | $_____ |
> | 3. | Permanent impairment and/or disfigurement | $_____ |
> | 4. | Loss of capacity for the enjoyment of life - past | $_____ |
> | 5. | Loss of capacity for the enjoyment of life - future | $_____ |
>
>     b.        ECONOMIC DAMAGES
>
> | | | |
> |---|---|---|
> | 1. | Medical care services to date | $_____ |
> | 2. | Future medical care services | $_____ |
> | 3. | Value of earning capacity lost - past | $_____ |
> | 4. | Value of earning capacity lost - future | $_____ |
> | | TOTAL | $_____ |
>
> Date: _____                                _____
>                                              JURY FOREPERSON

After providing the jury with the form, the trial court explained that "in reporting your verdict, it is not necessary that you break your verdict down into the individual elements of damages, but you must report your award, if any, in a single sum." Then the trial court explained that the purpose of the verdict form was "to aid you [the jurors] in your deliberations." It also explained that if the jury decided that Shoney's negligence caused Ms. Overstreet's injuries, it must

> set forth the amount of damages, if any, you find have been proven by a preponderance of the evidence in each of the following categories. And then I have the categories listed as I did in the charge: Physical pain and suffering in the past. Physical pain and suffering in the future. Permanent impairment and/or disfigurement. Loss of capacity for the enjoyment of life in the past. Loss of capacity for the enjoyment of life in the future.
> And then the income [economic] damages: Medical care for services to date. Future medical care services. Value of earning capacity lost in the past. Value of earning capacity lost in the future.

> Then you will total any figures that you have found on any of those items. And then you'll date the form and the jury foreperson will sign it.
>
> When you report your verdict, any figure you award would be the total of all the damages for the sum of any figures for elements of damages that you have calculated. That is the total figure if any.

After deliberating for approximately two and one-half hours, the jury returned a general verdict against Shoney's for $2,013,000. Notwithstanding the request by counsel for Shoney's to review the verdict form, the trial court placed the form under seal, stating that "in the event it becomes appropriate to open it at some future time, we'll do that." Among the post-trial motions Shoney's filed was a motion for permission to examine the verdict form. After reviewing the verdict form, Shoney's pointed out that the jury's informal calculations on the back of the verdict form were $200,000 less than the damage calculations that had been filled in on the front of the form.[8] The trial court denied the post-trial motions, approved the jury's verdict, and rendered a judgment accordingly.

## B.

### SHONEY'S DEMAND FOR A GENERAL VERDICT

Shoney's argument that the trial court's verdict form undermined its right to a general verdict is flawed for two reasons. First, Shoney's had no right to a general verdict when this case was tried. Second, the trial court's verdict form, which was the functional equivalent to special interrogatories, did not prevent the jury from returning a general verdict.

A general verdict is nothing more than a composite decision of the jury based on the jury's determination of the facts and its application of the law, as charged by the trial court, to the facts. *See* Lawrence A. Pivnick, *Tennessee Circuit Court Practice* § 26-3 (1998). It is a unitary finding by the jury on all the issues between the parties including damages. *See Hulshof v. Noranda Aluminum, Inc.*, 835 S.W.2d 411, 420 (Mo. Ct. App. 1992); *Grumman Credit Corp. v. Rivair Flying Serv., Inc.*, 845 P.2d 182, 185 (Okla. 1992); *Owens v. McBride*, 694 P.2d 590, 593 (Utah 1984).

---

[8] Shoney's has not raised this issue on appeal, and therefore, we have not addressed it.

The amount of damages is expressed as a total sum. *See ITT Terryphone Corp. v. Tri-State Steel Drum, Inc.*, 344 S.E.2d 686, 691 (Ga. Ct. App. 1986).

When this case was tried, Tenn. R. Civ. P. 49.03[9] preserved a litigant's right to demand a general verdict "whenever such right is given by the Constitution of the State of Tennessee." However, ten years earlier, the Tennessee Supreme Court removed the substance of this rule, rendering it a hollow shell. The Court held that civil litigants do not have a constitutional right to have all the issues decided by the jury at one time through a general verdict. *See Ennix v. Clay*, 703 S.W.2d 137, 139 (Tenn. 1986). Rule 49.03 only protected the right to a general verdict if that right was constitutionally mandated. Since general verdicts, such as the one Shoney's requested, are no longer constitutionally mandated, Rule 49.03 was meaningless at the time of trial.

The second flaw in Shoney's "general verdict" argument is that it overlooks the prerogative of the trial court to require the jury to answer special interrogatories even when one of the parties has requested a general verdict. *See Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 105 (Tenn. Ct. App. 1996). A number of states, either by statute or judicial decision, now require or permit the use of itemized damage verdicts similar to the verdict form used in this case. *See, e.g., Perry v. Allen*, 720 So.2d 614, 614-15 (Fla. Dist. Ct. App. 1998); *Shirley v. Smith*, 933 P.2d 651, 655 (Kan. 1997); *Tedeschi v. Burlington Northern R.R.*, 668 N.E.2d 138, 140 (Ill. Ct. App. 1996). Contrary to the assertions in Shoney's brief, we find nothing in *McIntyre v. Balentine*, 833 S.W.2d 52 (Tenn. 1992) calling into question the use of itemized verdict forms to aid the jury in calculating damages. Reporting a verdict in this manner, when preceded by proper instructions on damages, actually facilitates the trial court's ability to perform its role as the thirteenth juror, as well as the appellate court's ability to review the verdict for consistency and conformance with the evidence.

## C.

### DUPLICATIVE DAMAGES

---

[9]Tenn. R. Civ. P. 49.03 was repealed effective July 1, 1997. *See* Order, Tenn. Decisions LVIV, LVIII-LIX (Tenn. Mar. 12, 1997); Sen. Res. of Apr. 21, 1997, Sen. Res, No. 24, 1997 Tenn. Pub. Acts 1323; House Res. of Apr. 28, 1997, House Res. No. 47, 1997 Tenn. Pub. Acts 1487.

Shoney's also insists that the itemization of damages on the verdict form permitted the jury to award duplicative damages. Specifically, it asserts that the damages for pain and suffering, disfigurement, and loss of capacity to enjoy life overlap. Ms. Overstreet responds that Shoney's should not be permitted to raise this issue on appeal because it did not take issue with the trial court's jury instructions on damages.

We will first consider whether Tenn. R. App. P. 36(a) prevents Shoney's from raising this issue on appeal. It would have been better practice had Shoney's taken issue with the trial court's damage instructions or requested additional instructions concerning the components of each element of damage and a complete instruction patterned after T.P.I. 3 - Civil 14.01. However, we have determined that not raising these matters with the trial court does not prevent Shoney's from challenging the verdict form. The verdict form, more so than the instructions themselves, emphasizes the jury's prerogative to assign a separate monetary loss for each type of damages requested by Ms. Overstreet. Thus, notwithstanding the trial court's use of the term "if any" in its instructions and the verdict form, the verdict form is more conducive to duplicate, overlapping damage awards if the different measures of damages listed on the form actually overlap. We have determined, however, that the different measures of damages sought by Ms. Overstreet represent separate and distinct losses.

It will be helpful at the outset to define each of the non-economic damages that the jury awarded – pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life – both past and future. Although conceptually they all can be encompassed within the general rubric of pain and suffering, each of these types of damages are separate and distinct losses to the victim. *See Thompson v. National R.R. Passenger Corp.*, 621 F.2d 814, 824 (6th Cir. 1980). The drafters of the Tennessee Pattern Jury Instructions have reached a similar conclusion. *See* T.P.I. 3 - Civil 14.10 through 14.17.

Pain and suffering encompasses the physical and mental discomfort caused by an injury. *See Rufino v. United States*, 829 F.2d 354, 359 n.8 (2nd Cir. 1987); *Kirk*

*v. Washington State Univ.*, 746 P.2d 285, 292 (Wash. 1987). It includes the "wide array of mental and emotional responses" that accompany the pain, characterized as suffering, *See McDougald v. Garber*, 504 N.Y.S.2d 383, 385 (N.Y. Sup. Ct. 1986); such as anguish, distress, fear, humiliation, grief, shame, or worry. *See* Charles T. McCormick, *Damages* § 88, at 315 (1935). The extreme discomfort caused by lying in a hospital bed in a leg traction device with holes punched in one's limbs is an example of the pain and suffering for which damages may be awarded. *See Owen v. Locke*, 650 S.W.2d 51, 52 (Tenn. Ct. App. 1983).

A permanent injury differs from pain and suffering in that it is an injury from which the plaintiff cannot completely recover. *See Jordan v. Bero*, 210 S.E.2d 618, 630 (W. Va. 1974). It prevents a person from living his or her life in comfort by adding inconvenience or loss of physical vigor. *See Wheeler v. Bennett*, 849 S.W.2d 952, 955 (Ark. 1993). Disfigurement is a specific type of permanent injury that impairs a plaintiff's beauty, symmetry, or appearance. *See Rapp v. Kennedy*, 242 N.E.2d 11, 13 (Ill. App. Ct. 1968). Permanent injury may relate to earning capacity, pain, impairment of physical function or loss of the use of a body part, *see Yates v. Bradley*, 396 S.W.2d 735, 738 (Mo. Ct. App. 1965), or to a mental or psychological impairment. *See Kerr v. Magic Chef, Inc.*, 793 S.W.2d 927, 929 (Tenn. 1990); *International Yarn Corp. v. Casson*, 541 S.W.2d 150, 152 (Tenn. 1976).

Damages for loss of enjoyment of life compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life. *See Thompson v. National R.R. Passenger Corp.*, 621 F.2d at 824; *Martin v. Southern Ry.*, 225 Tenn. 77, 80-81, 463 S.W.2d 690, 691 (1971) (approving an award for the "intangible elements of damage such as pain, suffering, inconvenience, and deprivation of the normal enjoyments of life"); *Mariner v. Marsden*, 610 P.2d 6, 12 (Wyo. 1980). This type of damage relates to daily life activities that are common to most people. *See, e.g.*, *Nemmers v. United States*, 681 F. Supp. 567, 575 (C.D. Ill. 1988) (going on a first date, becoming a parent, reading, debating politics); *Dyer v. United States*, 551 F. Supp. 1266, 1281 (W.D. Mich. 1982) (sense of taste); *Sweeney v. Car/Puter Int'l Corp.*, 521 F. Supp. 276, 288 (D.S.C. 1981) (recreational or family activities). It can also compensate a victim for the loss of uncommon individual pursuits or talents. *See e.g.*, *District of Columbia v. Woodbury*, 136 U.S. 450, 459 (1890) (contributing articles to professional journals); *McAlister v. Carl*, 197 A.2d 140, 145 (Md. 1964) (inability to continue in a particular career); *Kirk v. Washington*

*State Univ.*, 746 P.2d at 292-93 (ballet). The policy underlying the award of loss of enjoyment damages is of making the victim whole in the only way a court can – with an equivalent in money for each loss suffered. *See Thompson v. National R.R. Passenger Corp.*, 621 F.2d at 824.

Ms. Overstreet received $150,000 for past pain and suffering, $100,000 for future pain and suffering, $1,250,000 for permanent impairment and/or disfigurement, $150,000 for past loss of enjoyment of life, and $100,000 for future loss of enjoyment of life. After considering the evidence presented at trial, we have determined that it supports each element of the jury's award of damages.

Ms. Overstreet suffered a painful injury to her left eye, underwent five invasive surgical procedures involving hospital stays, and suffered mental anguish, including the uncertainty of not knowing whether she would ever see out of her left eye again. She was required to wear an unattractive eye shield and to suffer through the embarrassment of having strangers stare at her disfigured eye. When the surgical attempts to re-attach her retina failed, she had to accept that she would never see out of her left eye and that she had suffered a permanent, career-ending disability. Her eye remains red, inflamed, and sensitive, and she will always be afraid of losing the sight in her right eye and becoming completely blind.

Ms. Overstreet's permanent injuries include the loss of vision and the accompanying disfigurement, a vocational disability, and the profound impact the injury has had on her psychological health. Her injury translates to a twenty-five percent impairment to her visual system and a twenty-four percent impairment to her body as a whole. She has lost vision in her left eye, and her left eye is now disfigured because it is noticeably smaller than the right eye and is constantly inflamed. Her efforts to use a scleral shell to minimize the cosmetic disfigurement have been unsuccessful. Ms. Overstreet testified that the shell never got comfortable, that it felt like it was scraping her eye, and that when she removed it with a stopper it felt like "it was going to suction my eye out." Instead, she always wears glasses, which protect her right eye from injury.

Ms. Overstreet's injury has also changed her personality significantly. The psychological effects of the accident have affected all areas of Ms. Overstreet's life and have fundamentally changed her self-perception. Prior to her injury, Ms.

Overstreet was self-assured, motivated, and enthusiastic; now, she is fearful and withdrawn and has no self-confidence. The deterioration of her psychological health was noted by her husband, her nursing professors, and her physicians, all of whom testified to her feelings of despair and powerlessness. One of her physicians, who prescribed anti-depressants for Ms. Overstreet, testified that she has a low threshold for self-destructing and lacks self-confidence since the injury. While Ms. Overstreet's psychologist testified that she was no longer suicidal, he could not predict an end to her treatment for post-traumatic stress disorder, anxiety attacks, and depression.

A rehabilitative counselor who evaluated Ms. Overstreet concluded that her injury had caused a vocational disability because of the physical and emotional requirements of nursing. Ms. Overstreet's loss of depth perception makes it difficult for her to measure medicines and to give intravenous injections, both of which are necessary tasks of her job. Her potential to advance in her career has been hindered, and it is unlikely she will be able to reach her prior career goals.

The evidence also supports the award for loss of enjoyment of life. While wearing her eye shield, Ms. Overstreet could not swim or wash her own hair, and she was forced to avoid heavy lifting and driving. Ms. Overstreet testified that she cannot do much of her housework without assistance and that she no longer enjoys socializing or even leaving the house. She is constantly afraid that something will happen to her right eye and that she will be left totally blind. She must avoid lawnmowers or anything else that could throw projectiles, and she no longer swims because the chlorine and salt water hurt her eye. Sometimes she burns herself when she cooks and she testified that she will not risk going rafting, canoeing, or playing tennis. Mr. Overstreet testified that his wife no longer wants to go out and that she bumps into people because she doesn't see them coming on her left side. He also observed that she is nervous around glass objects and that she hates going to work because she cannot tolerate the stress.

In light of this evidence, we find no evidence of duplicative damages. Ms. Overstreet has clearly suffered past and future damages of pain and suffering, permanent disfigurement and impairment, and loss of enjoyment of life as a direct result of the injury and loss of vision in her left eye.

# V.

## THE DENIAL OF A NEW TRIAL AND REMITTITUR

Shoney's asserts that the trial judge did not properly perform its function as thirteenth juror because it failed to weigh the evidence independently. Shoney's also contends that the evidence preponderates against the jury's award of $1,250,000 in damages for Ms. Overstreet's permanent impairment and/or disfigurement and that the trial court erred by declining to suggest a remittitur of that damage award. We do not agree.

## A.

## THE TRIAL COURT'S DUTY AS THIRTEENTH JUROR

Shoney's insists that the trial court's comments at the hearing on the post-trial motions demonstrate that the trial court was inappropriately deferential to the jury's verdict and that it did not independently evaluate the evidence. It bases this assertion on comments such as "proof that would justify a jury in believing," "the jury had an adequate basis," and "the jury could have concluded." While these comments reveal the trial court's respect for the jury's conclusion, they do not indicate that the trial court abrogated its responsibility as thirteenth juror.

The thirteenth juror rule requires the trial court to weigh the evidence independently, to determine the issues, and to decide whether the verdict is supported by the evidence. *See Ladd v. Honda Motor Co.*, 939 S.W.2d at 105; *Loeffler v. Kjellgren*, 884 S.W.2d 463, 468-69 (Tenn. Ct. App. 1994). Although we may consider any comments made by a trial judge during a hearing on the motion for new trial, *see Ridings v. Norfolk S. Ry.*, 894 S.W.2d 281, 289 (Tenn. Ct. App. 1994), we must, in the final analysis, determine whether the trial court properly reviewed the evidence and agreed or disagreed with the verdict. *See Ladd v. Honda Motor Co.*, 939 S.W.2d at 104; *Herbert v. Brazeale*, 902 S.W.2d 933, 936 (Tenn. Ct. App. 1995). We cannot review the accuracy of the trial court's determination as thirteenth juror. *See State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995).

At the hearing for the motion for new trial, the trial court stated that "[s]ince the time of this trial, I have reviewed the verdict in my own mind and reviewed the evidence of damages with relationship to the verdict on several different occasions."

The trial court added that it believed that the non-economic damages far exceeded the economic damages in the case and that the injury had had a significant impact on Ms. Overstreet. After considering all the elements of damages, the trial court concluded that it did not disagree with the $2,013,000 verdict and that each element of damages was supported by the evidence and was within the range of reasonableness. After considering the record as a whole, we have concluded that the trial court competently performed its role as thirteenth juror.

## B.
### THE TRIAL COURT'S REFUSAL TO SUGGEST A REMITTITUR

Shoney's also contends that the trial judge should have suggested a remittitur. It asserts that a $1,250,000 award for permanent disfigurement or impairment is excessive because Ms. Overstreet suffered a loss of vision in only one eye and because the disfigurement of her left eye was minimal. We respectfully disagree. Like the trial court, we are impressed by the evidence of the profound impact this injury has had on Ms. Overstreet.

Acting as the thirteenth juror, the trial court may set aside a jury's verdict and order a new trial. *See Hardesty v. Service Merchandise Co.*, 953 S.W.2d 678, 681 (Tenn. Ct. App. 1997). When the trial court finds that the amount of the verdict is excessive or inadequate, it may suggest a remittitur or an additur in lieu of granting a new trial. *See* Tenn. Code Ann. § 20-10-102 (1994); *Hardesty v. Service Merchandise Co., Inc.*, 953 S.W.2d at 681. This procedure avoids the necessity of conducting a new trial with its added expense and delay. *See Foster v. Amcon Int'l, Inc.*, 621 S.W.2d 142, 147 (Tenn. 1981).

However, when a trial court approves a jury verdict, appellate courts may only review the record to determine whether it contains material evidence to support the jury's verdict. *See* Tenn. R. App. P. 13(d); *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994); *Whitaker v. Harmon*, 879 S.W.2d 865, 867 (Tenn. Ct. App. 1994). Appellate courts do not reweigh the evidence and consider where the preponderance lies. Instead, they determine whether there is any material evidence to support the verdict, and, if there is, they must affirm the judgment. *See Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d at 823; *Pullen v. Textron, Inc.*, 845 S.W.2d 777, 780 (Tenn. Ct. App. 1992).

The jury bears primary responsibility for awarding damages in a personal injury action, followed closely by the trial court in its role as thirteenth juror. *See Coffey v. Fayette Tubular Products*, 929 S.W.2d 326, 328 (Tenn. 1996); *Sholodge Franchise Sys., Inc. v. McKibbon Bros., Inc.*, 919 S.W.2d 36, 41 (Tenn. Ct. App. 1995). When a trial court approves a verdict awarding damages in a personal injury action, our review is subject to the rule that if there is any material evidence to support the jury's award, it should not be disturbed. *See Hunter v. Burke*, 958 S.W.2d 751, 757 (Tenn. Ct. App. 1997).

We have concluded that there is material evidence to support the jury's award of $1,250,000 for permanent impairment and disfigurement. Shoney's has underestimated the significance of Ms. Overstreet's psychological impairment and has minimized the effect of her physical disfigurement. Although this type of injury may not impact every person in such a profound way, in Ms. Overstreet's case, the effects have been far-reaching.

A former nursing instructor, who once evaluated Ms. Overstreet as a committed, exceptional, and positive student, testified that she had lost these qualities since the injury. She observed that Ms. Overstreet no longer bubbles with enthusiasm and is now convinced that her career is over. Ms. Overstreet's psychological problems have manifested themselves in mistakes at work, indecision about whether she can adequately perform her job, a sixty-pound weight gain, and a loss of interest in daily activities. Ms. Overstreet continues to suffer from post-traumatic stress syndrome, anxiety attacks, and depression, even though she is no longer suicidal.

The timing of the accident intensified the psychological impact of Ms. Overstreet's injuries. It occurred just as Ms. Overstreet was ready to begin her new career and her married life. She was about to realize her career goals. Although Ms. Overstreet continues to have the intellectual ability and qualifications to pursue a graduate degree, she no longer has the confidence and emotional stability that post-graduate nursing education would require. She testified that she had wanted to pursue her master's degree after a year of practical experience, but that she has now abandoned these plans because she doubts her abilities.

Along with the loss of vision, the disfigurement to Ms. Overstreet's left eye is substantial. Because her left eye is red, inflamed, and smaller than her right eye, the

injury detracts from the symmetry and beauty of Ms. Overstreet's face. The eye appears as if it is half-closed and it is obvious from even a cursory glance that her eye has been injured. This permanent disfigurement to her appearance will continue to negatively affect Ms. Overstreet's self-image for the rest of her life. The permanent impairment also encompasses Ms. Overstreet's vocational disability. She will be limited in her career choices and in the opportunity for advancement in her chosen vocation, because of both the loss of vision and the psychological damage from the injury.

In summary, we have concluded that the record contains material evidence to support the jury's decision to award Ms. Overstreet $1,250,000 for permanent injury and disfigurement. Accordingly, we do not find that the trial court erred by declining either to set this award aside or to suggest a remittitur.

## VI.

We affirm the judgment awarding Ms. Overstreet $2,013,000 in damages and remand the case to the trial court for whatever further proceedings may be required. We tax the costs of this appeal to Shoney's, Inc. and its surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
BEN H. CANTRELL, JUDGE


_____
WILLIAM B. CAIN, JUDGE