71979, 71980. ITT TERRYPHONE CORPORATION v. TRI-STATE STEEL DRUM, INC.; and vice versa.
(344 SE2d 686)

BIRDSONG, Presiding Judge.

Tort — Apportionment of Damages. Considering the facts in the light of the jury's verdict, we conclude the following circumstances and events gave rise to the controversy between these parties. Tri-State Steel Drum, Inc. (Tri-State) is an enterprise located in North Georgia close to the Tennessee state line. It buys used steel 55-gallon drums and refurbishes these steel drums for resale. Prior to 1979, Tri-

State leased telephone services from South Central Bell Telephone which included three telephone numbers, incoming telephone lines, numerous telephone receivers strategically placed throughout the plant and the necessary lines and switches to connect the instruments to the main box where the three telephone numbers were delivered by the incoming telephone lines. On one of these incoming lines was attached a CAU coupler which allowed Tri-State to own and operate a fire and burglar alarm. This coupler was owned by Bell and was furnished at a fee to Tri-State for the limited purpose of connecting the alarm systems to one of the leased telephone numbers. Tri-State needed and utilized the alarm systems because it was in an isolated rural area not near a fire or police station. Thus if a fire or burglary occurred, when heat in the plant reached a certain point a heat sensor was activated immediately causing a tape recorded message to be telephoned out to the police or fire station and designated employees of Tri-State notified. If an entry into the plant occurred, a similar call was placed.

In early 1979 in addition to the Bell telephone equipment, Tri-State also owned an intraplant communications system manufactured and installed in the plant by ITT Terryphone Corporation (ITT), a subsidiary of International Telephone and Telegraph. A sales representative of ITT approached the owner and CEO of Tri-State in 1979 suggesting that Tri-State could buy a telephone system from ITT, connect it with the ITT intercom system already in place in the plant and make an ultimate savings by eliminating the leased Bell equipment. Tri-State made the purchase and ITT installed its telephone equipment in the plant in May 1979.

When the CEO of Tri-State made the purchase of ITT equipment, he specifically inquired of the sales representative as to the continued availability of the fire and burglar alarm which was attached to Bell's incoming line. There is no dispute that ITT did not sell or service burglar or fire alarms and Tri-State did not expect such service from ITT. However, the ITT representative expressly reassured Tri-State's CEO that there would be no interruptions of the alarm service and for Tri-State not to worry about the service as a result of the changeover from Bell telephone service to the ITT system. In accordance with usual practice, ITT exacted from Tri-State an agency agreement so that all inquiries and problems arising during the cut over from Bell to ITT would be dealt with between ITT and Bell, eliminating Tri-State from problem solving during the cut over. In accordance with the agency agreement, ITT sent a request to Bell asking Bell to remove all its internal telephone equipment from the plant on the same day that ITT completed the installation of the ITT system. The proposed plan was that ITT would install a complete telephone system and run that to the box on the wall of the plant to

which the three incoming Bell numbers ended. Then by a series of clips (or connectors) at the box, the three numbers were connected to the ITT system. It was clear therefore that the ITT system (now owned by Tri-State) did not include a fire or a burglar alarm inasmuch as the two alarms were connected to one of the three incoming lines owned by Bell and leased by Tri-State and connected to the incoming line by a CAU coupler also owned by Bell. This was on the "Bell" side of the connecting box (in effect on the outside of the plant) rather than on the "ITT" side on the inside of the plant.

In the request submitted by ITT to Bell for the removal of Bell's intraplant telephone equipment, ITT made no mention of the fire or burglar alarm systems nor the retention of the connection of the alarm to the incoming Bell line and number. ITT"s testimonial excuse for the absence of any reference to the alarm systems was that the ITT equipment had nothing to do with the incoming lines (except where the incoming line was connected to the ITT equipment) and the alarms were connected to Bell's leased equipment outside the connector box through a coupler also owned by Bell. Nevertheless, it was shown that on the request form from ITT to Bell there was a section dealing with special instructions where it was conceded if ITT had any special requests of Bell those instructions would have there been incorporated. When the request was received by Bell for removal of *all* its equipment in May 1979, the request was processed through to the Bell business office where a computer operator originated a work order for the removal of *all* Bell's telephone equipment. Inasmuch as no mention was made of the alarm systems or the coupler connecting the alarm systems to the incoming leased line and number (which of course was retained by Tri-State), the work order directed the removal of all equipment outside of the three numbers coming into the plant. It was equally clear however that Bell was or should have been aware that the coupler attaching the alarm systems to an incoming leased number was not affected by the replacement and removal of its intraplant telephone equipment by that of ITT because the coupler was attached to the incoming line and number before that line was connected to the ITT system. Nevertheless, in spite of its contract to furnish the coupler service to Tri-State for the alarm system and all the previous billing for that service, it is manifest that Bell made no inquiry of ITT nor of Tri-State as to what disposition was desired of the coupler and the use to which it had been put.

Thus in May 1979, the ITT equipment was installed and connected to the Bell incoming lines and numbers, the Bell equipment was removed (as ordered by ITT), and the coupler likewise was removed and the alarm service disconnected. During the months of May, June, July, and August 1979, weekly routine tests were continued by Tri-State of the fire alarm and burglar alarm (but not to in-

clude an actual outgoing call) to ascertain if the systems were functional. Each system tested as fully operational. On the night of Friday, August 24, 1979, the Tri-State maintenance team conducted its routine weekly maintenance check of the plant, turned off the power, activated the fire and burglar systems and left the plant at about 8:00 p.m. At about 8:30 p.m., a nearby neighbor observed a faint glow as of a small brush fire in the vicinity of the plant, but the neighbor did not feel any apprehension. At about 9:20 p.m. that same neighbor was aroused by two fishermen who excitedly notified her that the plant was on fire. When she looked on this occasion, she noted the plant was engulfed in flame and the fire was very advanced. She called the fire department which arrived on the scene within less than 20 minutes. Because of the magnitude of the fire, other nearby firefighters were called and the fire was ultimately extinguished about 12:00 p.m. Expert testimony was received to the effect that if the fire alarm had been connected to the telephone line, the heat sensor probably would have alerted the firefighters within 10-15 minutes and the firefighters would have been on the scene within approximately 30 minutes. In actual fact, the firefighters did not arrive until approximately 9:45 p.m. or more than an hour after the fire apparently was first observed. It was further stated in expert opinion that the damages would have been much less significant had the firefighters arrived 30-40 minutes earlier, it being shown that a fire doubled in size approximately every 5 minutes.

Tri-State brought this action against ITT alleging negligence in failing to carry out its voluntarily assumed duty to make certain the fire and burglar alarm systems would remain operational after the cut over and against Bell for failing to ascertain from ITT or Tri-State what disposition was to be made of the coupler connecting the alarm systems to Bell's telephone line. After an eight-day trial, the jury returned a verdict in favor of Tri-State in the amount of $379,854, apportioning the verdict against ITT in an amount of $295,442 and against South Central Bell in the amount of $84,412. There being no objection to the form of the verdict, the trial court entered judgment on the verdict of the jury. South Central Bell entered no appeal to the verdict and judgment. ITT filed its appeal, raising several asserted trial errors. Tri-State filed a cross-appeal solely to protect its judgment. *Held*:

1. In its first enumeration of error, ITT complains the trial court erred in denying the motion for directed verdict at the time of trial, and in its second enumeration, the failure of the trial court to grant ITT's motion for new trial.

The first error is predicated upon three separate bases. First, it is asserted that the contract was exclusive of the rights between the parties and the contract did not provide at all for services dealing with

an alarm system. ITT also urged that the language of the contract excluded liability for fire damage. Lastly, it argued that Bell disconnected the fire alarm without any direction from ITT and thus was exclusively liable for any possible damages resulting from negligent acts.

(a) We find no substantial merit in the exclusivity of the language of the contract. While it is true that the statute of frauds provides a contract may not be modified orally to encompass things not included within the contract, nevertheless, it also is true that an independent duty could arise from a course of dealing between the contracting parties. OCGA § 51-1-8. If Tri-State relied on that assumption of duty by ITT to its prejudice, then ITT would become liable for negligence in the exercise of or failure to exercise that duty. See *Sims v. American Cas. Co.*, 131 Ga. App. 461, 468, 473, 478-479 (206 SE2d 121). In this case, Tri-State had leased from Bell the use of a telephone line for the purpose of making outgoing fire and burglar alarms through a coupler attaching the alarms to the telephone number. Its contract was with Bell and ordinarily it would or should have protected its interests through its own efforts. However, ITT had expressly assured Tri-State that it (ITT) would undertake this responsibility and had taken a power of attorney relieving Tri-State from any responsibility dealing with the replacement of the phone system to include the certainty of continued alarm service after the cut over. Under these facts, we find the promise of ITT gave rise to a separate duty not arising out of the contract for telephone service but supplemental thereto. One who, by a gratuitous promise or other conduct which he should realize will cause another reasonably to rely upon the performance of definite acts of service by him, causes the other to refrain from having such acts done by other available means is subject to a duty to use care to perform such service or to give notice he will not so perform. *Mixon v. Dobbs Houses*, 149 Ga. App. 481, 483 (254 SE2d 864). Thus the jury was warranted in concluding that ITT's failure to make certain that the alarm system remained operational after the cut over violated an assumed duty. See *Pennsylvania Millers Mut. Ins. Co. v. Thomas Milling Co.*, 137 Ga. App. 430, 432 (2) (224 SE2d 55); *Frank Graham Co. v. Graham*, 90 Ga. App. 840, 842 (84 SE2d 579).

The third predicate for this enumeration falls for the same reason. Again, it is true that ITT had no contractual obligation to furnish alarm services and indeed had no control over such services. It likewise is true that they did not order Bell to remove the coupler and Bell elected to do so upon its own authority. Nevertheless, ITT directed Bell to remove *all* its telephone equipment without clarifying the retention of the coupler connecting the alarm to the leased telephone line as it promised Tri-State it would do. Bell did as ordered

even though its telephone equipment which was being replaced did not include the outside coupler. That of course was the reason the jury apportioned the monetary damages between the two independent but concurrent tortfeasors.

(b) As to ITT's second predicate for this enumeration (that the contract excluded fire damage), ITT seeks to have this court construe the contract provision out of context. The language upon which ITT relies clearly relates to damages arising out of "delays" in performance of the contract caused by fire. The facts of this case are wholly unrelated to damages arising out of nonperformance of the contract caused by fire delays.

2. In its second enumeration of error, ITT urges the trial court erred in denying its motion for new trial. Once again this has several predicates. ITT argues that the disconnection of the fire alarm did not cause the fire; therefore, Tri-State would have suffered some degree of damage even if the alarm had remained connected. It contends the jury awarded Tri-State the totality of its losses, thus the damages were not properly adjusted as between those naturally suffered by Tri-State and any tortfeasor.

We find no merit in this argument. Tri-State offered proof that it had suffered loss of business profits during the time its plant was being made operational after the fire (August 1979-January 1980 and continuing through 1980) in an amount of $160,560 to over $700,000. The value of the destroyed buildings was placed at $250,000-260,000. Certain equipment used in steel drum restoration was damaged or destroyed. The cost of reconstruction or reconditioning of this equipment was $153,485. Even without considering the loss of profits engendered by the loss of customers caused by the inability to deliver steel drums while the plant was out of business and who did not return their business for the year following the loss, the evidence clearly reflects loss of profits and building and equipment losses exceeding $500,000. ITT would have us speculate upon what basis the jury determined the amount of the monetary verdict and how that verdict was apportioned between Tri-State, Bell and ITT.

We conclude that the verdict in the case was a general verdict. There was no allocation of damages for lost profits, or for destroyed or damaged equipment, or for destroyed buildings. The verdict was for a total sum for damages. It is clear that the question of damages as a result of negligence is a matter best left in the province of a jury. See *Hogan v. Olivera*, 141 Ga. App. 399, 401-404 (233 SE2d 428). The evidence presented a wide range of potential damages depending upon which evidence the jury accepted as reflective of the truth of the situation. The verdict of the jury fell well within that range. An excessive or inadequate verdict flows usually from a mistake of fact rather than a mistake of law where the jury properly is instructed. The va-

lidity of the verdict addresses itself to the discretion of the trial court initially. This court as an appellate court is one for the correction of trial court errors. If there was no error of law by the trial court and the evidence supports the judgment entered upon the verdict by the trial court, we have no reason or authority to reverse such a judgment. *Seaboard Coast Line R. v. Towns*, 156 Ga. App. 24 (274 SE2d 74). Such is the result in the instant case.

ITT also contends that the jury had no authority to apportion the amount of damages and there was no rational basis for such apportionment. It argues that the trial court should have refused such an apportioned verdict and returned the jury for further deliberations until it arrived at a legal verdict.

We have difficulty with this argument for two reasons. In the first place, ITT did not object to the jury's verdict nor request a verdict in a different form. Thus we are first of all concerned with the right of ITT to raise such an objection for the first time upon motion for new trial and now before this court. See *Golosky v. Wherle*, 117 Ga. App. 335 (160 SE2d 614). More importantly is the underlying basis for the damages awarded in this case. It is true that damages for personal injury may not be apportioned, for an injury to the body or feelings is manifestly not severable into parts. Moreover, where *joint* tortfeasors produce a single indivisible personal injury not subject to a rational apportionment, apportionment should not be permitted. However, Georgia has recognized that where damages are to property as opposed to the person, the jury may apportion the damages between two or more defendants contributing to those damages. This rule was recognized in *McCalla v. Shaw*, 72 Ga. 458, as early as 1884. That rule has been recognized and reaffirmed as recently as the case of *H. Elton Thompson & Assoc. v. Williams*, 164 Ga. App. 571 (298 SE2d 539), a 1982 decision of this court. We are satisfied that the jury was authorized to assess a general and total amount of damages in favor of Tri-State for the loss of its property and then apportion those damages between the two concurrent tortfeasors. See *Jones v. Hutchins*, 131 Ga. App. 808, 809 (2) (207 SE2d 224). See also *MARTA v. Tuck*, 163 Ga. App. 132, 137-138 (292 SE2d 878).

ITT also argues in support of this enumeration that the evidence is speculative and does not support the verdict. We have carefully examined this transcript and are satisfied the argument offered in support of this enumeration based upon the general grounds is without merit. There was ample evidence before this jury to show negligence on the part of both ITT in failing to carry out its assumed duty and on the part of Bell in failing to ascertain Tri-State's desires concerning the continued leasing of the coupler activating the alarm systems. The evidence of damages suffered by Tri-State is undisputed, with only the amount being placed in controversy. That being a question

best left to the jury, we need only look to see if the verdict is supported. As indicated hereinbefore, we have found such support. This predicate for ITT's enumeration thus is without merit.

In view of the disposition of the main appeal, Tri-State's cross-appeal is rendered moot.

*Judgment affirmed in Case No. 71979. Appeal dismissed in Case No. 71980. Banke, C. J., concurs. Sognier, J., concurs in judgment only.*

DECIDED APRIL 8, 1986.

*Fred M. Milligan, John D. Barry*, for ITT Terryphone.
*Charles W. Dooley, James R. McKoon, David Noblitt*, for Tri-State Steel.
*Norman S. Fletcher, Robert Boehm*, for South Central Bell.