**Debra Jo EDWARDS, Plaintiff–Appellant,**

v.

**HONEYWELL, INCORPORATED, and Honeywell Protection Services, Defendants–Appellees.**

No. 94–2346.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1995.

Decided March 23, 1995.

Rehearing Denied April 11, 1995.

W. Scott Montross (argued), Townsend, Hovde & Montross, Indianapolis, IN, David W. Stone, IV, Anderson, IN, Thomas A. Hendrickson, Indianapolis, IN, for plaintiff-appellant Debra Jo Edwards.

Thomas J. Campbell (argued), Thomas R. Schultz, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for defendants-appellees Honeywell, Inc., Honeywell Protection Services.

Before POSNER, Chief Judge, and BAUER and ROVNER, Circuit Judges.

POSNER, Chief Judge.

A fireman's widow has sued Honeywell, the provider of an alarm system intended to

protect the house where her husband was killed in the line of duty. The suit, filed in an Indiana state court, charges that David John Edwards died because of Honeywell's negligence in failing to call the fire department promptly upon receiving a signal from the alarm. As a result of the delay, the floor of the burning house was in a severely weakened condition by the time the firemen entered, and it collapsed beneath Edwards, plunging him to his death. The district court, to which the suit had been removed under the diversity jurisdiction, granted summary judgment for Honeywell. The court held that Honeywell owed no duty of care to fireman Edwards under the common law of Indiana. The widow's appeal requires us to grapple with the elusive concept of "duty" in the law of torts.

In 1982 Honeywell had made a contract with a couple named Baker to install (for $1,875) and monitor (for $21 a month) an alarm system in the Bakers' house. The house is a wood-frame house located in a suburb of Indianapolis and ordinary in every respect except that the Bakers conducted an interior-decorating service out of the basement. The contract limited Honeywell's liability to the Bakers for the consequences of any failure of the system to $250. The validity of this limitation is not questioned. *Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 48–49 (2d Cir.1993).

The alarm system was of a type that has become common. If the house was entered while the alarm was turned on, and the alarm was not promptly disarmed, or if someone in the house pushed either a "panic button" or a button on the alarm console labeled fire, police, or emergency medical service, a signal was automatically transmitted over the telephone lines to a central station maintained by Honeywell. The person manning the station (called the "alarm monitor") would call the fire department if the fire or medical-emergency button had been pressed, and otherwise would call the police department. After that the alarm monitor would call a neighbor of the subscriber. The contract required the subscriber to inform Honeywell which police and fire department and which neighbor should be notified, and presumably the Bak-

ers had done this back in 1982, though whether accurately or not we do not know. Honeywell does not make any effort to assure the accuracy of, or keep up to date, the information furnished by the subscriber concerning whom to call.

Six years passed. It was now an afternoon in the winter of 1988, and Mrs. Baker was working in the basement with two of the employees of the decorating service when she heard a sound. She looked up and noticed an orange glow in the furnace room. One of the employees opened the door to the room, revealing a shelving unit in the furnace room already engulfed in flames from floor to ceiling. Mrs. Baker ran upstairs and tried to dial 911 but misdialed. She gave up on the phone and pushed two buttons on the control panel of the alarm system. One was the fire button, the other the police button. Then she grabbed her dog and ran out the front door. The two people who had been working in the basement with her fled at the same time; they were the only other people in the house. They drove to their home, which was just a couple of blocks away, to call the fire department, while Mrs. Baker, her sandals slipping on the ice, ran from house to house until she found one in which someone was at home. That person, a babysitter, called the Lawrence Township fire department. The call was placed between one and four minutes after Mrs. Baker triggered the alarm in her house. We must give the plaintiff the benefit of the doubt (her case having been dismissed on a motion for summary judgment) and therefore assume that it was four minutes, in which event, as we are about to see, the township fire department received the babysitter's call no earlier than it received the call from Honeywell's central station. (If the call had been received much earlier, the plaintiff's complaint about Honeywell's delay might be academic.)

The signals from the Bakers' house had come into the central station at 2:54 p.m., triggering an audible alarm. The alarm monitor, hearing it, had pressed a function key, causing the relevant information about the Bakers to flash on the screen of her computer. The display told her to call the Indianapolis Fire Department (Honeywell's

policy, if both the police and the fire signals are transmitted by the alarm system, is to call only the fire department). So she pushed the "direct fire button" to the Indianapolis Fire Department, connecting her immediately with the department's dispatcher. She gave the dispatcher the Bakers' address. The dispatcher told her that it was within the jurisdiction of a different fire department, that of the City of Lawrence, to which the dispatcher transferred the call. That was wrong too. It was the fire department of Lawrence Township that had jurisdiction over the Bakers' house. So the dispatcher for the City of Lawrence transferred the call that had been relayed to the City of Lawrence's fire department.

Had Honeywell's operator called the township's fire department first, rather than reaching that department as it were on the third try, it would have taken no more than 45 seconds for the department to learn of the fire at the Bakers' house. Because of the jurisdictional error, it was not until 2:58 that the department received the call. The 45 seconds had been stretched to four minutes because of the misinformation in Honeywell's computer. The plaintiff claims, and for purposes of this appeal we accept, that Honeywell was careless in not having a procedure for verifying and updating such essential information as which fire department to call in the event of a fire in a subscriber's premises, since the boundaries between fire districts are shifted from time to time.

A Lawrence Township fire chief arrived at the scene at 3:00 p.m. (This was remarkably prompt, the call having come in only two minutes earlier. But the Bakers' residence was only a mile or a mile and a half from the firehouse. This shows by the way the importance of notifying the right fire department.) He saw dark smoke but no flames. Mrs. Baker was there and told him that she thought her furnace had exploded. The chief did not ask her when the fire had started but assumed that, because Mrs. Baker had been at home, she had notified the fire department immediately. This implied that the fire was less than three minutes old. Five minutes later, at 3:05 p.m., two parties of firemen began leading hoses into the house, entering

through the front door and the garage (which was on the side of the house) respectively. The floor was hot to the touch (firemen customarily enter a burning building on all fours because smoke and heat rise), and the group that had entered through the front door quickly withdrew, fearing that the floor would collapse. The smoke thickened. Fire was seen darting from the roof. Edwards, an experienced fireman, was one of two men who had entered the house from the garage. Sometime between 3:10 and 3:15, before he could withdraw from the house, the floor collapsed and he fell into the basement and was asphyxiated.

The house was severely damaged by the fire, and the Bakers have since moved to another house. They no longer subscribe to Honeywell's alarm service.

We may assume that the firemen would have arrived a little more than three minutes earlier (to be exact, four minutes minus 45 seconds earlier) had Honeywell's call gone to the right fire department directly rather than having to be relayed. Whether fireman Edwards' life would have been saved is obviously a highly speculative question. *Robinson v. Southern New England Tel. Co.,* 140 Conn. 414, 101 A.2d 491, 493 (1953); *Pope v. Pinkerton–Hays Lumber Co.,* 120 So.2d 227, 232 (Fla.App.1960). It depends on what the firemen would have done with the extra three minutes and 15 seconds. If they would have brought the fire under control in that time, then the floor might not have collapsed. But if at the end of that period they would still have been laying their hoses (no water had yet been applied to the fire when the firemen withdrew and the floor collapsed), the floor would have collapsed just as it did and Edwards would have been killed just as he was. Absence of evidence that the delay of which the plaintiff complains made any difference to Edwards' fate was not, however, the ground on which the district judge dismissed the suit. Nor does Honeywell urge it as an alternative ground for affirming the judgment.

Honeywell does urge a related alternative ground, that Edwards would have been killed even if the Bakers hadn't had an alarm system at all, since in its absence it would surely

have taken Mrs. Baker four minutes to reach the fire department, the time she took (by the plaintiff's own estimate) to reach the neighbor's house and get the babysitter to call. This is not so clear as Honeywell makes out. Before fleeing the house, Mrs. Baker pressed the alarm buttons. Had there been no alarm buttons, she might have redialed 911. (She knew her mistake. She had dialed 1911.) This is the theory on which a rescuer is required to act nonnegligently even if he was not obliged to attempt the rescue in the first place: his effort may have deflected alternative attempts at rescue, here a more determined use of the phone. *Jackson v. City of Joliet*, 715 F.2d 1200, 1202–03 (7th Cir.1983); *Abresch v. Northwestern Bell Tel. Co.*, 246 Minn. 408, 75 N.W.2d 206 (1956). The principle is illustrated by the well-known *Stewart* case, where a railroad by stationing a watchman at a crossing induced reliance on his presence and was held liable for an accident that would have been prevented had he been present, even though due care did not require the railroad to have a watchman at that crossing in the first place. *Erie R.R. v. Stewart*, 40 F.2d 855 (6th Cir. 1930). *Stewart* is not an Indiana case, but its principle is accepted in Indiana. *Runde v. Vigus Realty, Inc.*, 617 N.E.2d 572 (Ind.App. 1993); *Richardson v. Gallo Equipment Co.*, 990 F.2d 330, 332 (7th Cir.1993) (applying Indiana law); *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 967 (7th Cir.1983) (ditto).

To bolster its position on causation, Honeywell argues that if it had *really* screwed up, so that the fire department hadn't arrived on the scene until the fire was visibly raging, none of the firemen would have dared enter the house and so Edwards would have been saved. The argument in effect is that alarm systems endanger firemen, so the provider of a system that works badly or not at all should be rewarded by being excused from liability. It is a strange argument even if its premise is granted, which it should not be. Fire departments want to be summoned as soon, not as long, after a fire has started as possible, because in general though not in every case large fires are more dangerous than small ones and fires are more likely to be large the

longer they are allowed to burn out of control, although of course at some point a fire will burn itself out and thus cease to be dangerous. (It would be *some* fire department that thought the best time to fight fires was after they had burned themselves out.) Honeywell's bad argument was invited by the plaintiff's bad argument—an argument supported by the fire chief's affidavit but still preposterous—that a fire doubles every five minutes. There is no such law of nature. (Which doesn't mean it has never been recited in a judicial opinion. See *ITT Terryphone Corp. v. Tri–State Steel Drum, Inc.*, 178 Ga. App. 694, 344 S.E.2d 686, 689 (1986). Contra, *Lebanon, Louisville & Lexington Tel. Co. v. Lanham Lumber Co.*, 131 Ky. 718, 115 S.W. 824, 826 (1909).) The rate at which a fire grows depends on environmental conditions, such as the flammability of the materials set on fire and of those within reach of the flames, the amount of oxygen in the air, the air temperature, and whether the air is moving or still. It is impossible to say a priori whether if the firemen had arrived several minutes later the fire would have grown to a size that would have deterred them from entering the house.

As the premise of our further discussion, we may assume without having to decide not only that Honeywell breached its duty of care to the Bakers by not updating the information in its computer on which fire department to call if the Bakers' house caught on fire, but also that as a consequence of this breach fireman Edwards died. We are speaking of a tort duty of care founded on the reasoning underlying the rescue cases, not a contractual duty; there is no suggestion that Edwards was a third-party beneficiary of the contract between Honeywell and the Browns.

The question we must decide, therefore, is whether Honeywell's duty of care extended to firemen who might be summoned to fight the blaze, for, if not, the plaintiff's suit was properly dismissed. *Why* duty should be an issue in a negligence case is not altogether clear, however, and the quest for an answer may guide us to a decision.

Nowadays one tends to think of negligence, even when one is a lawyer or judge thinking about the legal rather than the lay term, as a synonym for carelessness. But originally negligence signified carelessness only in the performance of a duty, whether a duty arising from an undertaking (for example that of a surgeon) or a duty imposed by law, such as an innkeeper's duty to look after his guests' goods. It was not until the nineteenth century that a general principle of liability for the careless infliction of harm was securely established. J.H. Baker, *An Introduction to English Legal History* 467–76 (3d ed. 1990). But as liability for negligence expanded, the judges felt a need to place limitations on its scope and to rein in juries, and the concept of duty was revived to name some of these limitations and to exert some control over juries. Negligence was redefined as the breach of a duty running from the injurer to the injurer's victim to exercise due care, and the question whether there was such a duty in the particular case or class of cases was, and remains, a matter for the judge to decide, not the jury. *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind.1991); *Miller v. Griesel*, 261 Ind. 604, 308 N.E.2d 701, 706 (1974); *Czarnecki v. Hagenow*, 477 N.E.2d 964, 967 (Ind.App.1985). Admittedly these are state cases and the procedures applied in federal court, even when federal jurisdiction is based solely on diversity of citizenship, are federal. The distinction between substance and procedure is, however, notably obscure, and with regard to ostensibly procedural rules that seem likely to affect behavior outside the litigation process itself (the parol evidence rule is a good example) the tendency is for the federal court to treat the rule as one of substance in order to avoid subjecting people to conflicting rules, and therefore apply state law. E.g., *AM International, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 576 (7th Cir.1995); *Coplay Cement Co. v. Willis & Paul Group*, 983 F.2d 1435, 1438 (7th Cir.1993). Federal courts in diversity cases have almost always treated the issue whether there is a duty of care as one of law, and have done so on the authority of state cases without even considering the possibility that the issue might actually be governed by federal law. E.g.,

*Trevino v. Union Pacific R.*, 916 F.2d 1230, 1235 (7th Cir.1990); *Ross v. United States*, 910 F.2d 1422, 1427 (7th Cir.1990); *LaMontagne v. E.I. Du Pont De Nemours & Co.*, 41 F.3d 846, 856 (2d Cir.1994); *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1114 (11th Cir.1992); but cf. *Marshall v. Perez Arzuaga*, 828 F.2d 845, 848–49 (1st Cir.1987). The parties to our case do not quarrel with this approach; nor is there any reason to suppose that if federal law governed, the federal rule would be different from the rule that, so far as we are aware, prevails in every state—the rule that makes the issue of duty one of law. There is no occasion to explore the issue further in this case, and we can turn back to the issue of the scope of the tort duty of care under the common law of Indiana.

Should a passerby be liable for failing to warn a person of a danger? The courts thought not, and therefore said there is no tort duty to rescue. Even if the defendant had acted irresponsibly or even maliciously in failing to warn or rescue the passerby— suppose, for example, the defendant had been aware of the danger to the plaintiff and could have warned him at negligible cost— the plaintiff could not obtain damages. *Yania v. Bigan*, 397 Pa. 316, 155 A.2d 343 (1959); *Osterlind v. Hill*, 263 Mass. 73, 160 N.E. 301 (1928); *Handiboe v. McCarthy*, 114 Ga.App. 541, 151 S.E.2d 905 (1966). This limitation on the scope of the duty of care has stood but others have fallen by the wayside in most or all states, such as the nonduty of care of a manufacturer to users of his defective products other than the first purchaser, *Winterbottom v. Wright*, 10 M. & W. 109, 152 Eng.Rep. 402 (Ex. 1842), the nonduty of care of an accountant to persons who rely on his audit report but have no contractual relation with him, *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, J.), and the nonduty of care of railroads in avoiding fire damage to anyone other than the owner of buildings or other property actually struck by the railroad's sparks, as opposed to owners of property to which the fire that had been started by those sparks spread. *Ryan v. N.Y. Central R.R.*, 35 N.Y. 210 (1866).

Of particular relevance to the present case are two lines of precedent. Indeed the present case could be said to lie at their intersection. One concerns the duty of care to an unforeseeable victim. The classic case is *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99 (1928) (Cardozo, J.). The defendant's employees, in attempting to help a passenger aboard a moving train, dislodged his package. The package, which unbeknownst to the railroad's employees contained fireworks, fell on the tracks, and exploded when the passenger car that the jostled passenger had just entered, minus his package, rolled over it. The explosion damaged the platform and injured people standing on it, including the plaintiff. The carelessness of the railroad's employees had foreseeably imperiled the passenger attempting to board the train (and his property), but not Mrs. Palsgraf, who was standing on the platform at some unknown distance from the car, waiting for another train. The court held that the railroad had breached no duty of care *to her*. The Indiana courts accept *Palsgraf's* exclusion of liability to unforeseeable victims. *Webb v. Jarvis, supra,* 575 N.E.2d at 997; *Fawley v. Martin's Supermarkets, Inc.,* 618 N.E.2d 10, 13 (Ind.App.1993); *Northern Indiana Public Service Co. v. Sell,* 597 N.E.2d 329, 332 (Ind.App.1992); *Thiele v. Faygo Beverage, Inc.,* 489 N.E.2d 562, 574 n. 4 (Ind.App.1986). So if fireman Evans was an unforeseeable victim of Honeywell's negligence, this suit must fail.

The other line of cases concerns the duty of care of water companies, telephone companies, and other providers of services of the public utility type—today including alarm services—to the general public as opposed to customers. Again the most famous cases are Judge Cardozo's. *H.R. Moch Co. v. Rensselaer Water Co.,* 247 N.Y. 160, 159 N.E. 896 (1928), held that a company which had contracted to supply water to a city and its residents was not liable for the consequences of a fire that the fire department was unable to bring under control (with resulting damage to the plaintiff's property) because the water company failed through carelessness to maintain adequate pressure in the water mains. *Kerr S.S. Co. v. Radio Corp. of America,* 245 N.Y. 284, 157 N.E. 140 (1927),

held that careless failure to transmit the plaintiff's telegram, a failure that caused the plaintiff to lose a valuable contract, was not a tortious wrong to the plaintiff. Cf. *EVRA Corp. v. Swiss Bank Corp.,* 673 F.2d 951 (7th Cir.1982). Telegraph companies have gone by the board. But there have been cases which hold that telephone companies can be liable for fire damage resulting from an operator's failure to transmit a distress call, *Abresch v. Northwestern Bell Tel. Co., supra; Jennings v. Southwestern Bell Tel. Co.,* 307 S.W.2d 464 (Mo.1957); *Adams v. Carolina Tel. & Tel. Co.,* 59 N.C.App. 687, 297 S.E.2d 785 (1982)—and an equal number of cases rejecting such liability. *Mentzer v. New England Tel. & Tel. Co.,* 276 Mass. 478, 177 N.E. 549 (1931); *Foss v. Pacific Tel. & Tel. Co.,* 26 Wash.2d 92, 173 P.2d 144 (1946); *Southwestern Bell Tel. Co. v. Norwood,* 212 Ark. 763, 207 S.W.2d 733 (1948).

We do not know the standing of the public utility cases in Indiana law. The courts of Indiana recognize as do all common law courts the duty limitation on tort liability, but they pitch the criterion for it at so high a level of generality, see, e.g., *Webb v. Jarvis, supra,* 575 N.E.2d at 997, that their position on those cases cannot be inferred from it. Other states do not have crisper formulations. See, e.g., *Widlowski v. Durkee Foods,* 138 Ill.2d 369, 150 Ill.Dec. 164, 166, 562 N.E.2d 967, 999 (1990). The matter may not lend itself to precise verbal formation. Even so, if the rest of the states were in agreement on the scope of the limitation with respect either to a case such as the present one or to the class of cases illustrated by *Moch* and *Kerr,* we could assume that Indiana would fall into line. They are not. The principle of these cases is accepted in some jurisdictions, rejected in others. Compare *White v. Southern California Edison,* 25 Cal.App.4th 442, 30 Cal.Rptr.2d 431 (1994), and *Turbe v. Government of Virgin Islands,* 938 F.2d 427, 432–33 (3d Cir.1991), with *Long v. District of Columbia,* 820 F.2d 409, 418 (D.C.Cir.1987), and *Schmeck v. City of Shawnee,* 232 Kan. 11, 651 P.2d 585, 596–98 (1982). The split is mirrored in the cases closest to the present one—cases involving the liability of alarm services to noncustomers (none of them, how-

ever, firemen, policemen, or other rescue workers) for the consequences of the service's negligence. Compare *Elizabeth E. v. ADT Security Systems West, Inc.,* 108 Nev. 889, 839 P.2d 1308 (1992) (per curiam), and *Scott & Fetzer Co. v. Montgomery Ward & Co.,* 112 Ill.2d 378, 98 Ill.Dec. 1, 493 N.E.2d 1022 (1986), with *New Focus Sportswear, Inc. v. P.J. Fabrico, Inc.,* 167 A.D.2d 175, 561 N.Y.S.2d 570 (1990), and *Hill v. Sonitrol of Southwestern Ohio, Inc.,* 36 Ohio St.3d 36, 521 N.E.2d 780, 783–84 (1988). There are no Indiana cases concerning the liability of alarm services to noncustomers.

The basic criticism of both the *Palsgraf* and *Moch–Kerr* lines of decisions, articulated with characteristic force by Judge Friendly in *Petition of Kinsman Transit Co.,* 338 F.2d 708, 721–26 (2d Cir.1964), is that since by assumption the defendant was careless (for the concept of duty would have no liability-limiting function otherwise), why should its carelessness be excused merely because either the particular harm that occurred as a consequence, or the person harmed as a consequence, was unforeseeable? If the Long Island Railroad's employees had avoided jostling the passenger carrying the bundle of fireworks, as due care required them to do, Mrs. Palsgraf would not have been injured. If the water company had kept up the pressure, as it was contractually obligated to do, the fire would not have raged out of control. And if Honeywell had used due care in identifying the fire department with jurisdiction over a fire in the Bakers' house, Edwards (we are assuming for purposes of this appeal) would not have been killed. In none of these cases would the defendant, in order to prevent the injury of which the plaintiff was complaining, have had to exercise more care than it was required by law to exercise anyway.

The arguments on the other side, the arguments in favor of the duty limitation in these cases, are twofold. The first arises from the fact that a corporation or other enterprise does not have complete control over its employees, yet it is strictly liable under the principle of respondeat superior for the consequences of their negligent acts committed in the scope of their employment. It is not enough to say to the enterprise be careful and you have nothing to fear. The carelessness of its employees may result in the imposition of a crushing liability upon it. In order to know how many resources (in screening new hires and in supervising and disciplining workers after they are hired) to invest in preventing its employees from being careless, the employer must have some idea, some foresight, of the harms the employees are likely to inflict. Imposing liability for unforeseeable types of harm is unlikely, therefore, to evoke greater efforts at preventing accidents; it is likely merely to constitute the employer an insurer. The railroad in *Palsgraf* did not know that conductors who jostle boarding passengers pose a threat of injury by explosion to people standing elsewhere on the platform, and the water company in *Moch* did not know the likelihood of fires or the value of the property that might be damaged by them.

The second argument in favor of using the concept of duty to limit the scope of liability for careless acts, an argument relevant to *Moch* and *Kerr* though not to *Palsgraf,* is that the defendant may not be in the best position to prevent a particular class of accidents, and placing liability on it may merely dilute the incentives of other potential defendants. In most cases the best way to avert fire damage is to prevent the fire from starting rather than to douse it with water after it has started. The water company represents a second line of defense, and it has no control over the first. It cannot insist that people not leave oil-soaked rags lying about or that they equip their houses and offices with smoke detectors and fire extinguishers.

How far in general these arguments outweigh the consideration emphasized by Judge Friendly is a matter of fair debate; but they are especially powerful in *this* case, and remember that Indiana is a jurisdiction that follows *Palsgraf.* The provider of an alarm service not only has no knowledge of the risk of a fire in its subscribers' premises, and no practical ability to reduce that risk (though we suppose an alarm service like a fire insurer could offer a discount to people who installed smoke detectors in their premises); it also lacks knowledge of the risk of a

fire to firemen summoned to extinguish it. That risk depends not only on the characteristics of the particular premises but also on the particular techniques used by each fire department, the training and qualifications of the firemen, and the quality of the department's leadership. The alarm company knows nothing about these things and has no power to influence them.

The death of a fireman in fighting a residential fire appears to be a rare occurrence. And we have not been referred to a single case in which such a death was blamed on a malfunction, human or mechanical, in an alarm system. The problem of proving causation in such a case is, as we saw, a formidable one, and the plethora of potential defendants makes it difficult (we should think) for an alarm company to estimate its likely liability even if it does foresee the kind of accident that occurred here. If "unforeseeable" is given the practical meaning of too unusual, too uncertain, too unreckonable to make it feasible or worthwhile to take precautions against, then this accident was unforeseeable. *Mang v. Palmer*, 557 So.2d 973, 975 (La.App. 1990). Honeywell would have difficulty figuring out how careful it must be in order to satisfy its legal obligations or how much more it ought to charge its subscribers in order to cover its contingent liability to firemen and to any others who might be injured in a fire of which the alarm company failed to give prompt notice. Similar problems of debilitating legal uncertainty would arise if the person injured were a police officer or a paramedic rather than a firefighter.

The alarm service constitutes, moreover, not a first or second line of defense against fire but a third line of defense—and in this case possibly a fourth, fifth, or ... *n*th. The first is the homeowner. We do not know why the Bakers' furnace exploded—whether it was because of a defect in the furnace or a failure by the Bakers or others to inspect or maintain it properly. The second line of defense is the fire department. Potential defendants in this case included not only the alarm service and the fire department (though presumably the plaintiff's only remedy against the department would be under Indiana's public employees' compensation

law), but the Bakers, the manufacturer of the furnace, any service company that inspected or maintained the furnace, possibly even the supplier of the wood for the floor that collapsed or the architect or builder of the house. The plaintiff has chosen to sue only the alarm service. Of course none of the others may be negligent. And if any of the others are, conceivably the alarm service might implead them so that liability could come to rest on the most culpable. Yet it is also possible that the principal attraction of the alarm service as a defendant is that it is a large out-of-state firm with deep and well-lined pockets. We can only speculate. All things considered, however, the creation of a duty of care running from the alarm service to Edwards is likely to make at best a marginal contribution to fire safety and one outweighed by the cost of administering such a duty. That at least is our best guess as to how the Supreme Court of Indiana would evaluate this case were it before that court.

Pointing to the $250 limitation of the alarm service's liability to the Bakers, the plaintiff argues that if Honeywell prevails in this suit, alarm services will have no incentive to take care. But they will. Honeywell lost the Bakers' business. Our society relies more heavily on competition than on liability to optimize the quality of the goods and services supplied by the private sector of the economy. A case such as this does Honeywell's customer relations no good even if it wins the case—as we think it must.

The district court did not consider another alternative ground urged by Honeywell for the dismissal of the suit, that liability to fireman Edwards is barred by the "fireman's rule." The rule, in force in Indiana, *Fox v. Hawkins,* 594 N.E.2d 493 (Ind.App.1992); *Kennedy v. Tri–City Comprehensive Community Mental Health Center, Inc.,* 590 N.E.2d 140 (Ind.App.1992), as well as in other states, see, e.g., *Santangelo v. State,* 71 N.Y.2d 393, 526 N.Y.S.2d 812, 521 N.E.2d 770 (1988); *Benefiel v. Walker,* 244 Va. 488, 422 S.E.2d 773 (1992), is that a fireman (or a policeman or other public safety worker) injured as a consequence of the negligence of whoever caused the fireman to be summoned has no tort claim against that person. The

idea behind the rule is a bit elusive, but seems connected with the fact that the fire department does not charge victims of fire for the expense of putting out the fire, or with a sense that the victim of fire has suffered enough and ought not to be burdened with a suit, or a sense that the pay of firefighters reflects the hazards of their occupation—though those hazards might be fewer if the people who caused the hazards were liable to firemen injured as a consequence. Unclarity about the rationale of a rule makes its scope difficult to determine, creating uncertainty in this case whether it extends to an alarm company. The alarm company did not cause the fire department to be summoned except in the sense of providing a conduit through which Mrs. Baker summoned the fire department. The company could be regarded as her agent, and thus entitled to her immunity, or it could conceivably be regarded as a third party who inflicts injury after the fireman arrives on the scene; such injuries have been held to fall outside the fireman's rule, as in *Lipson v. Superior Court*, 31 Cal.3d 362, 182 Cal.Rptr. 629, 644 P.2d 822 (1982). We need not decide. Even if the fireman's rule is inapplicable, Honeywell was entitled to dismissal of the suit because it had no duty of care to firefighters engaged in fighting a fire on its customer's premise.

AFFIRMED.