In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1185

WILDER CORPORATION OF DELAWARE,

*Plaintiff-Appellant*,

v.

THOMPSON DRAINAGE AND LEVEE DISTRICT,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 1:09-cv-01322-MMM-JAG—**Michael M. Mihm**, *Judge*.

ARGUED SEPTEMBER 7, 2011—DECIDED SEPTEMBER 27, 2011

Before POSNER, FLAUM, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*.  This appeal from the grant of summary judgment to the defendant in a diversity suit governed by Illinois law tests the outer limits of the common law doctrine of indemnity.

The word "indemnity" is from a Latin word that means "security from damage." The most common form of indemnity in modern life is an insurance contract: *A* is harmed by conduct covered by an insurance contract issued by insurance company *B*; the contract secures

*A* from the harm by shifting its cost to *B*. But indemnity is not limited to insurance contracts (indemnity provisions are frequently found in other contracts, as in *HK Systems, Inc. v. Eaton Corp.*, 553 F.3d 1086 (7th Cir. 2009))—or, more to the point, to contracts, period. For there is a tort doctrine of indemnity, which shifts the burden of liability from a blameless tortfeasor (which sounds like an oxymoron, but we're about to see that it isn't) to a blameworthy one. *American National Bank & Trust Co. v. Columbus-Cuneo-Cabrini Medical Center*, 609 N.E.2d 285, 287-88 (Ill. 1992); *Frazer v. A.F. Munsterman, Inc.*, 527 N.E.2d 1248, 1251-52 (Ill. 1988); *Schulson v. D'Ancona & Pflaum LLC*, 821 N.E.2d 643, 647 (Ill. App. 2004); *Restatement (Second) of Torts* § 886B (1979). The tort doctrine is sometimes called "implied indemnity" to distinguish it from contractual indemnity, but a clearer term is "noncontractual indemnity."

To illustrate: an employee, acting within the scope of his employment (whether or not with the authorization, or to the benefit, of his employer) negligently injures a person. The victim sues the employer, the employer being strictly liable for the employee's tort under the doctrine of respondeat superior. After paying a judgment to, or settling with, the victim, the employer, being itself blameless (respondeat superior is as we just said a doctrine of strict liability) turns around and sues the employee to recover the cost of the judgment or settlement, the employee being liable to the employer for that cost under the doctrine of noncontractual indemnity. This may seem a roundabout alternative to a rule that only the employee is liable. But it is more than that. The employee often will be

judgment-proof. In that event the employer won't be able to shift its liability to him, and so the employee will be underdeterred, to the detriment of the employer, whom respondeat superior will stick with liability for the employee's tort. This prospect gives an employer an incentive to try to prevent its employees from committing torts. The employer may screen applicants for employment more carefully, or monitor their performance at work more carefully, than it would do had it no back-up liability for its employees' torts. *Sullivan v. Freeman*, 944 F.2d 334, 336 (7th Cir. 1991); *Restatement (Third) of Agency* § 2.04 comment b (2006); Alan O. Sykes, "The Boundaries of Vicarious Liability: An Economic Analysis of the Scope of Employment Rule and Related Legal Doctrines," 101 *Harv. L. Rev.* 563, 569-70 (1988). Or it might try to reduce the number of negligent injuries inflicted by its employees by reducing the scale or scope of its activity; a reduction in output is one way of reducing potential tort liability. *Konradi v. United States*, 919 F.2d 1207, 1210 (7th Cir. 1990).

The twist in this case is that the party seeking indemnity (the plaintiff, Wilder) is trying to shift liability not for a tort but for a breach of contract.

Wilder owned 6600 acres of farmland, on which it grazed cattle, in Fulton County, southwest of Peoria; Fulton is a rural county bounded by the Illinois River. In 2000 Wilder sold the land for $16.35 million to The Nature Conservancy, the well-known environmental organization, which wanted to restore Wilder's land to its pre-twentieth century condition as an ecologically functional floodplain (that is, land adjacent to a body of water, in this case

the Illinois River, that overflows from time to time, soaking the land, creating wetlands that preserve biodiversity). The Conservancy claims that its restoration project is one of the largest such projects in the United States. The Nature Conservancy, "Illinois: Emiquon," www.nature.org/ourinitiatives/regions/northamerica/uni tedstates/illinois/placesweprotect/emiquon.xml (visited Sept. 11, 2011). (What had been Wilder's land now constitutes more than half of Emiquon Natural Wildlife Refuge.)

Wilder expressly warranted in the contract of sale that there was no contamination of the land by petroleum. But the land *was* contaminated by petroleum, though there is no indication that Wilder knew this and we'll assume it didn't.

Six years later the Conservancy, having discovered the contamination, sued Wilder in an Illinois state court for breach of warranty. The federal district court to which Wilder removed the case (the parties being of diverse citizenship) gave judgment for the Conservancy, awarding it some $800,000 in damages, though some of this amount reflected a separate breach of Wilder's contract with the Conservancy—its failure to clean up "sewage lagoons" in which it had deposited waste generated by its cattle.

Wilder appealed the judgment, unsuccessfully. See *Nature Conservancy v. Wilder Corp. of Delaware*, No. 09-2988, 2011 WL 3849627 (7th Cir. Sept. 1, 2011). It had already brought the present suit, a companion suit, against the local drainage district. Illinois drainage districts are public corporations directed and empowered to minimize damage from the overflow of waters that collect

on agricultural land. See D.L. Uchtmann & Bernard
Gehris, *Illinois Drainage Law* 14-23 (Dec. 1997),
http://web.aces.uiuc.edu/vista/pdf_pubs/DRAINAGE98.
pdf (visited Sept. 11, 2011). To facilitate the drainage
of excess water, the district had long ago obtained a right
of way on the land later bought by Wilder and had built a
pump house on the land to pump excess surface waters
into the Illinois River. To have at hand fuel for the pumps,
the drainage district stored petroleum both in storage tanks
that it owned in the vicinity, of which at least one was on
or under the land Wilder sold to The Nature Conservancy,
and in the pump house itself. (The Conservancy, wanting
to restore the land as wetlands, turned off the pumps.)

Wilder asks that the drainage district be ordered to
indemnify it for the money it's had to pay the Conservancy
as damages for its breach of warranty. It claims to be
entitled to indemnity because, it argues, negligent mainte-
nance by the drainage district of the pump house and the
storage tanks was the sole cause of the contamination of
the Conservancy's (formerly Wilder's) land. It argues
that it should have been allowed to conduct discovery to
try to prove that it was indeed blameless and the district at
fault.

The Nature Conservancy's suit against Wilder was a
contract suit rather than a tort suit. The warranty on which
the suit was based was, as we noted, imposed in the
contract of sale, not by law, as in the case of implied
warranties. Granted, Wilder's denial that it contributed
to the petroleum contamination is not inconsistent with
its having lost the suit brought by the Conservancy,

because liability for breach of contract is strict. As Holmes explained in *The Common Law* 300 (1881), "in the case of a binding promise that it shall rain to-morrow, the immediate legal effect of what the promisor does is, that he takes the risk of the event, within certain defined limits, as between himself and the promisee. He does no more when he promises to deliver a bale of cotton." But the blameless contract breaker ("blameless" in the sense that his breach was involuntary) cannot invoke noncontractual indemnity to shift the risk that he assumed in the contract.

The reasons are several. One is to head off the avalanche of litigation that might be triggered if an involuntary contract breaker could sue anyone for indemnity who a court might find had contributed to the breach. Suppose through negligence a livery service had failed to deliver Wilder's lawyer to a key negotiating session with The Nature Conservancy, and as a result the lawyer had been unable to review the warranty against petroleum contamination that the Conservancy wanted included in the contract of sale; had he been able to do so he would have persuaded Wilder not to agree to it. Could Wilder obtain a judgment against the livery service for indemnity?

It could not. The harm caused by the livery service's negligence would be deemed, as in such cases as *Edwards v. Honeywell, Inc.*, 50 F.3d 484, 489-91 (7th Cir. 1995), to have been unforeseeable. For how could the livery service have known what the consequences might be of failing to get the lawyer to his appointment in time? This case is less extreme. Although the drainage district may

not have known that Wilder had executed a warranty that would make it liable for any negligent leakage by the district, it would or should have known that it would be liable, if it created a nuisance on Wilder's land, to whoever owned the land when the nuisance materialized. But the defense against a suit brought not by the owner but by a guarantor would be more complicated than defending a nuisance case. For suppose, confident that it could shift the cost of any judgment obtained by The Nature Conservancy to the drainage district, Wilder had not put up a strong defense on the damages phase of the Conservancy's suit; then in Wilder's suit against the district for indemnity, the district would have to litigate the adequacy of Wilder's defense in the earlier suit. A further complication is that Wilder sold the land for a use that was likely to make petroleum contamination a far more serious problem than if the land had remained ranchland.

The present suit is barred as well by the economic-loss doctrine, which is also based (though only in part) on concern with liability for unforeseeable consequences, and which bars most negligence suits for purely financial loss (that is, a loss unaccompanied by personal injury or property damage), other than suits for fraud. "Otherwise," as we pointed out in *Wausau Underwriters Ins. Co. v. United Plastics Group, Inc.*, 512 F.3d 953, 957-58 (7th Cir. 2008) (Illinois law), "the extent of the seller's [for which read the drainage district's] liability would often depend on his purchaser's [Wilder's] contractual relations with third parties, something about which [the district] normally would know little."

To impose noncontractual indemnity in this case would have the further, perverse consequence of making the drainage district an insurer of Wilder's contract with The Nature Conservancy. One generally can't insure against a breach of contract, because of moral hazard (the tendency of an insured to be less careful about preventing the harm insured against than if it were not insured). *Krueger Int'l, Inc. v. Royal Indemnity Co.*, 481 F.3d 993, 996 (7th Cir. 2007). Yet Wilder seeks to make the drainage district the insurer of Wilder's breach of contract—and an involuntary insurer at that, as the district couldn't have prevented Wilder from warranting that the land it was selling to the Conservancy was uncontaminated, though it might have been able to intervene in the Conservancy's suit against Wilder to protect its interests.

We acknowledge that as between Wilder and the drainage district, the latter was in a better, and probably the only, position to prevent the contamination. And so Wilder can appeal to the principle, which underlies the tort doctrine of indemnity along with many other tort doctrines, that liability for inflicting a harm should come to rest on the party that could, at the lowest cost, have prevented the harm in the first place. See *Holtz v. J.J.B. Hilliard W.L. Lyons, Inc.*, 185 F.3d 732, 743 (7th Cir. 1999); *Edwards v. Honeywell, Inc.*, *supra*, 50 F.3d at 490-91; *Rankin v. City of Wichita Falls*, 762 F.2d 444, 448 n. 4 (5th Cir. 1985); *National Union Fire Ins. Co. v. Riggs National Bank*, 5 F.3d 554, 557 (D.C. Cir. 1993) (concurring opinion). The pump house, and the petroleum-storage tank or tanks on the property, were outside Wilder's control.

It had no right to oversee their maintenance. It might therefore seem to have a compelling argument for shifting liability for the contamination from its own shoulders to those of the district.

But the Illinois courts refuse to push the "least-cost avoider" principle that far and to allow the doctrine of indemnity to be used to shift damages for breach of contract to a third party whose negligence caused the breach. *Schulson v. D'Ancona & Pflaum LLC, supra*, 821 N.E.2d at 647-48; *Talandis Construction Corp. v. Illinois Building Authority*, 321 N.E.2d 154, 158-59 (Ill. App. 1974); *Board of Education of High School District No. 88 v. Joseph J. Duffy Co.*, 240 N.E.2d 5, 7-8 (Ill. App. 1968). Nor, as far as we've been able to determine, do courts in other jurisdictions apply the doctrine of indemnity in such circumstances.

This judicial forbearance is reasonable, though it would bind us whether it was or not. The requirement of foreseeability for liability in tort, and the economic-loss doctrine, and reluctance to allow a suit for breach of contract to spawn a tort suit, are all compelling reasons for that forbearance.

Had Wilder refused to give The Nature Conservancy a warranty against petroleum contamination, the Conservancy would doubtless have sued the drainage district for committing the tort of nuisance (it could not have sued Wilder for creating the nuisance—even if, as is doubtful, *Philadelphia Electric Co. v. Hercules, Inc.*, 762 F.2d 303, 312-16 (3d Cir. 1985), a buyer of land can ever sue his seller for creating a nuisance—because Wilder had

no control over the storage of petroleum by the drainage district). And then liability would have come to rest ultimately on the least-cost avoider. It was Wilder's choice to shoulder the risk of liability for petroleum contamination, and it would have been compensated in advance by getting a higher price for the land—it wouldn't have given such a dangerously broad warranty for nothing. One cannot be heard to complain when a risk materializes if one took it voluntarily because paid one's price for taking it.

Alternatively, Wilder could have insisted on the inclusion in its contract with The Nature Conservancy of a subrogation clause, whereby if forced to make good on its warranty Wilder would step into the Conservancy's shoes as plaintiff in a nuisance suit against the district. In *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293 (7th Cir. 1993), for example, a clause in the company's ERISA plan subrogated to the plan any claims by a beneficiary against a third party. The beneficiary was injured in an automobile accident, and the plan paid her medical expenses and by virtue of doing so acquired her tort claim against the injurer under the subrogation clause. By its warranty Wilder insured the Conservancy against petroleum contamination of the land Wilder was selling, and a subrogation clause would have authorized Wilder to sue the drainage district after making good on its warranty to the Conservancy; so again the ultimate liability would have come to rest on the least-cost avoider of the contamination—and again Wilder failed to take steps to accomplish this.

Subrogation is imposed usually by contract and some-
times (as in *Hunt Construction Group, Inc. v. Allianz
Global Risks U.S. Ins. Co.*, 503 F.3d 632 (7th Cir. 2007))
by statute, but shouldn't be available automatically to
every seller who provides his buyer with a warranty.
For then it would swallow the doctrine of indemnity:
unable to obtain indemnity because the doctrine cannot be
used to shift the cost of a breach of contract from
the contract breaker to a tortfeasor who contributed to the
breach, the contract breaker would call his claim against
the tortfeasor a subrogee's claim instead of a claim for
indemnity.

The spectre of automatic subrogation, divorced from a
contractual or statutory grant of subrogation rights
and potentially overlapping with indemnity and contribu-
tion (partial indemnity, from a joint tortfeasor that is
not entirely blameless), is presented by the doctrine of
"equitable subrogation" (which the Illinois courts also refer
to as "legal subrogation," though a more accurate term
would be "common law subrogation"): the provider to a
person of a benefit that was the primary obligation of a
third person may obtain restitution from that person if
necessary to prevent that person's being unjustly enriched,
even if no right of subrogation is conferred by contract or
statute. *Restatement (Third) of Restitution and
Unjust Enrichment* § 24 (2011); *American Nat'l Bank &
Trust Co. v. Weyerhaeuser Co.*, 692 F.2d 455, 460-61 (7th Cir.
1982) (Illinois law).

Equitable subrogation is a troublesomely vague doctrine:
"There is no general rule which can be laid down to

determine whether a right of [equitable] subrogation exists since this right depends upon the equities of each particular case." *Dix Mutual Ins. Co. v. LaFramboise*, 597 N.E.2d 622, 624. (Ill. 1992). So when, as in this case, contractual subrogation is feasible, it should be encouraged, rather than bypassed by appeal to equitable subrogation; for when it is feasible for parties to arrange their affairs by contract, they should have to do so rather than be allowed to make a court do it for them. Wilder could have protected itself against the drainage district's negligence by a subrogation clause in its contract with The Nature Conservancy, failed to, and has only itself to blame for that failure. It cannot invoke contractual subrogation, having failed to obtain a subrogation clause, and it has not invoked equitable subrogation—the scope of which under Illinois law we therefore need not try to determine.

AFFIRMED.